**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF ORTHOGEN
INTERNATIONAL GMBH,

                Petitioner,

for an order pursuant to 28 U.S.C. § 1782 to
conduct discovery for use in a foreign
proceeding.

:
:
:
:
:
:
:
:
:
:

  Case No. 1:24-mc-504

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.
Christopher B. Harwood
Matthew Garry
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com
mgarry@maglaw.com

*Attorneys for Petitioner Orthogen*
*International GmbH*

## Table of Contents

Table of Authorities ............................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 2

A.    Orthogen Learns of the Apparent Fraud by Mr. Capla and Dr. Schottenstein ................... 3

B.    Orthogen Seeks Section 1782 Discovery ........................................................................ 4

C.    Orthogen Obtains Information from Others that Supports this Petition ............................ 5

D.    Through this Petition, Orthogen Seeks Discovery from Judith and Tomas Capla ............. 8

BACKGROUND ................................................................................................................... 9

A.    Dr. Schottenstein and Mr. Capla's Obligation to Report Regenokine Treatments and Revenue to Orthogen ................................................................................................................ 9

B.    Mr. Capla and Dr. Schottenstein Apparently Underreported Regenokine Program Patient Treatments and Associated Revenue to Orthogen ...................................................... 10

C.    Ms. Chan and Mr. Lee Provided Orthogen With Information that Supports that It Was Defrauded and Underpaid by Mr. Capla and Dr. Schottenstein ................................................. 11

   1.    Ms. Chan and Mr. Lee Described Handwritten Ledgers Prepared by Mr. Capla With Information that Conflicts with Mr. Capla's Royalty Reports ............................... 12

   2.    Ms. Chan and Mr. Lee Provided Orthogen With Exemplar Ledgers .................. 13

D.    The Information Obtained Thus Far from Ms. Chan and Mr. Lee Supports that Orthogen Was Defrauded and Underpaid ................................................................................ 16

E.    Judith and Tomas Capla Possess Information that Orthogen Needs and Intends to Use in the Contemplated German Proceeding ........................................................................ 17

ARGUMENT ...................................................................................................................... 20

I.    THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782    20

A.    Judith and Tomas Capla Reside and/or Are Found in this District .................................. 20

B.    The Discovery Sought Is for Use in a Foreign Proceeding ............................................. 21

C.    Orthogen Is an "Interested Person" for Purposes of the Foreign Proceeding ................... 22

II.    THE FOUR DISCRETIONARY FACTORS FAVOR THE PETITION ....................... 22

A.    Judith and Tomas Capla Will Not Be Parties to the Foreign Proceeding ......................... 23

i

B.     A German Court Likely Would Be Receptive to the Requested Discovery ...................... 23

C.     Orthogen Is Not Circumventing Any German Proof-Gathering Restrictions ................... 24

D.     Orthogen's Discovery Requests Are Not Unduly Burdensome ......................................... 25

CONCLUSION ................................................................................................................................ 25

## Table of Authorities

**Cases**                                                                                     **Page(s)**

*Application of Esses*,
101 F.3d 873, 875 (2d Cir. 1996) ............................................................................ 22

*Application of Johannes Roessner*,
2021 WL 5042861 (S.D.N.Y. Oct. 29, 2021) ........................................................... 24

*BANOKA, S.à.r.l. v. Alvarez & Marsal Inc.*,
2024 WL 1242994 (S.D.N.Y. Mar. 22, 2024) ......................................................... 21

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015) ............................................................................. 20, 21

*Euromepa, S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) .................................................................................... 23

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ................................................................................................. 21

*Gushlak v. Gushlak*,
486 F. App'x 215, 217 (2d Cir. 2012) ...................................................................... 1

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017) .................................................................................... 20

*In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*,
121 F.3d 77 (2d Cir. 1997) ...................................................................................... 24

*In re Application of Hill*,
2007 WL 1226141 (S.D.N.Y. Apr. 23, 2007) .......................................................... 24

*In re Aso*,
2019 WL 3244151 (S.D.N.Y. July 19, 2019).......................................................... 23

*In re Bayerische Motoren Werke AG*,
2022 WL 2817215 (S.D.N.Y. July 19, 2022) .......................................................... 25

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) .................................................................................... 21

*In re Ex Parte Application of Porsche Automobil Holding SE*,

2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) .................................................................... 1

*In re Hansainvest,*
    364 F. Supp. 3d 243 (S.D.N.Y. 2018) ...................................................................... 24

*In re Iraq Telecom Ltd.,*
    2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019).......................................................... 23

*In re Kuwait Ports Auth.,*
    2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) .......................................................... 22

*In re Tiberius Grp. AG,*
    2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020)........................................................ 24, 25

*In re Zouzar Bouka; Vision Indian Ocean S.A.,*
    637 F. Supp. 3d 74, 84-85 (S.D.N.Y. 2022)................................................... 21, 22, 23

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004) ............................................................................... 21, 23, 25

*Kang v. Nova Vision, Inc.,*
    2007 WL 1879158 (S.D. Fla. June 26, 2007)........................................................... 24

*Mees v. Buiter,*
    793 F.3d 291 (2d Cir. 2015) .................................................................................... 24

*Schottenstein M.D., et al v. Lee et al,*
    1:22-cv-01197-DLC (S.D.N.Y.)............................................................................... 11

**Statutes**

28 U.S.C. § 1782......................................................................................................*passim*

28 U.S.C. § 1782(a) ........................................................................................................ 21

Orthogen International GmbH ("Orthogen") submits this memorandum of law, along with the declarations of Dr. Stefan Kruger ("Kruger Decl.") and Christopher B. Harwood ("Harwood Decl."), in support of its *ex parte* application for an order under 28 U.S.C. § 1782 ("Section 1782"), to conduct discovery for use in a foreign proceeding (the "Petition"). Orthogen has obtained evidence showing that the subjects of this Petition—Judith and Tomas Capla— possess information highly relevant to a proceeding that Orthogen will be initiating in Germany against two former licensees of its patented medical technology, Edward Capla (Judith and Tomas Capla's son) and Dr. Douglas Schottenstein.

Section 1782 petitions like this one routinely are granted *ex parte*, because, as here, the subjects of the discovery—and any other relevant parties—may challenge the applicant's right to the discovery once the subpoenas have been served. *See, e.g.*, *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012); *In re Ex Parte Application of Porsche Automobil Holding SE*, 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016). Edward Capla and Dr. Schottenstein are represented by counsel (as discussed below, Edward Capla and his wife, Yolanda, were the subjects of a related 1782 petition in Florida in which they were ordered to produce discovery, and Dr. Schottenstein is the subject of a related and pending 1782 petition in this district), but Orthogen does not understand Judith and Tomas Capla to be represented by counsel.

Accordingly, if this Court agrees that through this Petition, Orthogen has made a *prima facie* showing sufficient to warrant discovery of Judith and Tomas Capla, Orthogen requests that the Court grant the Petition and authorize it to serve the subpoenas submitted herewith on Judith and Tomas Capla, at which point they, Edward Capla, and/or Dr. Schottenstein can raise any objections they may have to the Petition. Although Orthogen is seeking *ex parte* relief, it simultaneously is (i) mailing copies of the Petition (and supporting papers) to Judith and Tomas

1

Capla, and (ii) emailing copies to counsel for Edward Capla and Dr. Schottenstein. If the Petition is granted, Orthogen simultaneously will serve copies of the subpoenas on Judith and Tomas Capla and counsel for Edward Capla and Dr. Schottenstein.

## PRELIMINARY STATEMENT

Orthogen, a German biotech company that licenses its patented medical technology—called the Regenokine Program—to physicians around the world, seeks discovery pursuant to Section 1782 for use in a civil proceeding that Orthogen will be filing in Germany based on the apparent underpayment of royalties it was due from two of its licensees, Edward Capla and Dr. Schottenstein (the "Contemplated German Proceeding").

During Orthogen's multi-year relationship with Mr. Capla[1] and Dr. Schottenstein, it received regular royalty reports from Mr. Capla identifying (i) the number of Regenokine Program treatments that were administered to patients through Dr. Schottenstein's practice, Schottenstein Pain and Neuro, PLLC d/b/a NY Spine ("NY Spine"), and (ii) the dollar amount invoiced to/paid by patients in connection with such treatments. Orthogen also received affidavits from Mr. Capla attesting to the accuracy of the information in the reports. Orthogen was to use, and did use, the figures in Mr. Capla's reports to invoice Mr. Capla and Dr. Schottenstein for their use of its Regenokine Program. Recently, Orthogen obtained evidence that Mr. Capla and Dr. Schottenstein defrauded it out of millions of dollars in royalty fees by submitting reports to it that substantially understated (i) the number of Regenokine Program patient treatments administered by NY Spine and (ii) the amounts Mr. Capla and Dr. Schottenstein were invoicing to/being paid by patients in connection with those treatments.

---

[1] Any references herein to "Mr. Capla" refer to Edward Capla, and any references to "the Caplas" refer to Edward and Yolanda Capla.  Orthogen always refers to Judith and Tomas Capla by their full names.

### A.  Orthogen Learns of the Apparent Fraud by Mr. Capla and Dr. Schottenstein

Orthogen first learned of the apparent fraud when, in a lawsuit that Dr. Schottenstein filed in December 2022 against it and Mr. Capla (among others) in this district (the "N.Y. Action"), Dr. Schottenstein included allegations in his verified complaint indicating that (i) the number of Regenokine Program patient treatments administered by NY Spine was far higher than Mr. Capla had reported, and (ii) Dr. Schottenstein and Mr. Capla each received millions of dollars more in connection with those treatments than would have been appropriate if the number of patient treatments reported to Orthogen was accurate.[2] Thereafter, Dr. Schottenstein filed two amended verified complaints in the N.Y. Action, in which he included the same or similar allegations. After Orthogen identified the implications of the allegations to Dr. Schottenstein and Mr. Capla, Dr. Schottenstein removed them from his fourth (and currently operative) verified complaint.

Dr. Schottenstein's allegations in the N.Y. Action indicate that for years he and Mr. Capla underpaid Orthogen royalty fees by providing it with false royalty reports. Upon seeing the allegations, Orthogen decided that it would file a lawsuit against Dr. Schottenstein and Mr. Capla in Germany (*i.e.*, the Contemplated German Proceeding),[3] in which it would assert claims for breach of contract and fraud. Before doing so, however, Orthogen determined that it would be prudent to seek discovery pursuant to Section 1782 from Dr. Schottenstein, NY Spine, and Mr. Capla and his wife (who performed work at NY Spine in connection with the Regenokine Program). Although Orthogen had evidence of the fraud, it did not know the full scope of the fraud and therefore, the full scope of its damages—both of which Orthogen needs to effectively

---

[2] In the N.Y. Action, *Schottenstein et al. v. Capla et al.*, No. 22-10883-PKC (S.D.N.Y.), Dr. Schottenstein is pursuing claims arising out of Orthogen's termination of his Regenokine Program license. On June 13, 2024, Dr. Schottenstein voluntarily dismissed Orthogen (and all individuals associated with it) from the case.

[3] Germany is a proper venue for such a lawsuit under the terms of Orthogen's license agreements with Dr. Schottenstein and Mr. Capla, which each contain a German forum selection clause.

pursue its claims in the Contemplated German Proceeding.

**B.   Orthogen Seeks Section 1782 Discovery**

Accordingly, in May 2023, Orthogen filed a 1782 petition against Dr. Schottenstein and NY Spine in this district (the "N.Y. 1782"), and a separate 1782 petition against Edward and Yolanda Capla in Florida (the "Florida 1782").[4] Dr. Schottenstein and the Caplas both moved to quash their respective 1782 petitions, raising a variety of meritless arguments. Dr. Schottenstein's motion to quash is fully briefed and awaiting decision, but the Caplas' motion was denied by the magistrate judge to whom it was referred. Thereafter, the Caplas tried a variety of tactics to avoid producing the discovery.[5] After the tactics all failed, the Florida magistrate judge issued an order requiring the Caplas to produce the requested discovery, in which he noted that "this case has been unnecessarily delayed at every turn by [the Caplas]." Harwood Decl., Ex. F at 3. The Caplas eventually produced documents on April 14, 2024, and sat for their depositions on April 23 and 24, 2024.

Based on the information Orthogen has obtained to date—including the documents produced and testimony given by the Caplas in the Florida 1782—Orthogen will be moving forward with the Contemplated German Proceeding. In addition to using the Caplas' discovery for the Contemplated German Proceeding, Orthogen also wanted to use it in support of this and other follow-on 1782 petitions. The Caplas' discovery, however, is subject to a Confidentiality Agreement that authorizes its use for the Contemplated German Proceeding, but not other 1782

---

[4] The N.Y. 1782 is *In Re: Orthogen International GmbH*, No. 1:23-mc-00152-VSB, and the Florida 1782 is *In Re: Orthogen International GmbH*, No. 9:23-cv-80743-DMM.

[5] The tactics included: (i) unsuccessfully appealing the magistrate judge's decision to the referring district judge, (ii) unsuccessfully moving the district judge for reconsideration of the decision authorizing the discovery, (iii) unsuccessfully moving the district judge for a stay of the decision authorizing the discovery after the Caplas appealed the decision to the Eleventh Circuit, and (iv) unsuccessfully moving the Eleventh Circuit for a stay of the decision authorizing the discovery pending its decision of the appeal. *See* Harwood Decl. ¶¶ 12, 14.

petitions. Accordingly, on May 18, 2024, Orthogen's counsel identified for the Caplas' counsel the specific documents and testimony that it wanted to use in connection with other 1782 petitions, explained why such information does not constitute the type of information that appropriately is withheld from legal filings, and requested that the Caplas agree to re-designate the information as non-confidential. The Caplas refused.[6] Because this Petition is amply supported without consideration of the Caplas' discovery, Orthogen has elected to move forward with this Petition rather than bear further cost and delay in continuing to seek re-designation.

### C. Orthogen Obtains Information from Others that Supports this Petition

Shortly before the Caplas' depositions, Orthogen obtained information from two former employees of Dr. Schottenstein, Pearl Chan and Derek Lee, that supports both its claims in the Contemplated German Proceeding and this Petition. Ms. Chan and Mr. Lee previously worked at NY Spine, and as detailed herein, (i) they were interviewed by Orthogen's counsel on April 3, 2024 in the presence of their counsel, (ii) during that interview, they made statements supportive of Orthogen's anticipated claims (including that Mr. Capla created monthly handwritten ledgers that, based on Ms. Chan and Mr. Lee's descriptions of the ledgers, report more patients treated and higher amounts paid by the patients than the royalty reports he provided to Orthogen, *and that Judith and Tomas Capla sometimes received a portion of Mr. Capla's share of those amounts paid*), and (iii) shortly after the interview, Ms. Chan and Mr. Lee, through their counsel, provided Orthogen's counsel with documents corroborating statements they made during their interview (*including copies of the handwritten ledgers for seven months, two of which reflect that Judith Capla received approximately one third of Mr. Capla's share of the amounts paid*).

---

[6] Consistent with the Florida magistrate judge's prior observation that the Caplas have caused "unnecessar[y] delay[]
at every turn," their counsel stated that "they could possibly reconsider their position if" Orthogen responded to a
series of inquiries, without any assurance that they would. *See* Harwood Decl., Exs. F, H.

In addition, through their counsel, Ms. Chan and Mr. Lee told Orthogen's counsel that they possess a substantial number of additional documents from their time working at NY Spine that may be relevant to Orthogen's anticipated claims. To facilitate their production of any such documents for use in the Contemplated German Proceeding, on June 20, 2024, Orthogen filed a 1782 petition in Texas directed at them (the "Texas 1782").[7] On July 16, 2024, the Texas 1782 petition was granted; on July 19, 2024, Orthogen served 1782 subpoenas for documents and testimony on Ms. Chan and Mr. Lee (through their counsel), with copies to counsel for Mr. Capla and Dr. Schottenstein; and on August 9, 2024, Ms. Chan and Mr. Lee began producing documents in response to the subpoenas. Texas 1782, Harwood Suppl. Decl. ¶ 10, Dkt. 12-1.

To date Ms. Chan and Mr. Lee have produced approximately 100 documents in response to the Texas 1782 subpoenas. *Id.* ¶ 14. Although Dr. Schottenstein received notice (i) on July 3, 2024, that the Texas 1782 had been filed, (ii) on July 19, 2024, that the Texas 1782 had been granted, and (iii) on August 15, 2024, that Ms. Chan and Mr. Lee had started producing documents, *id.* ¶¶ 10-11, he waited until September 3, 2024 to file a belated motion seeking to stay Ms. Chan and Mr. Lee's document production and require Orthogen to sequester the documents they produced to date. Texas 1782, Dkt. 10. Consistent with the Caplas' prior delay tactics, in that filing Dr. Schottenstein also stated that he would need until October 1, 2024 to file a formal challenge to the Texas 1782.[8] *Id.* In its September 10, 2024 opposition to Dr. Schottenstein's stay/sequester motion, Orthogen demonstrated that the motion should be denied because (i) Dr. Schottenstein did not come close to making any of the showings required to obtain such relief (including a likelihood of success on the merits of his then-unfiled challenge to

---

[7] The Texas 1782 is *In re Application of Orthogen International GMBH*, No. 5:24-mc-687-OLG (W.D. Tex.).

[8] Mr. Capla has not objected to the Texas 1782.

the Texas 1782), and (ii) the requested relief would be unfair to Orthogen because many of the documents produced to date by Ms. Chan and Mr. Lee strongly support Orthogen's claims in the Contemplated German Proceeding, and no reason exists to stop them from continuing to produce documents (including because in the unlikely event that Dr. Schottenstein prevailed on his challenge to the Texas 1782, the Texas Court could fashion appropriate relief at that time). Texas 1782, Dkt. 12 at 2-3; *id.*, Dkt. 12-1 ¶¶ 6-9.

Dr. Schottenstein did not bother filing a reply, and the Texas Court has not yet ruled on his stay/sequester motion. On October 2, 2024, Dr. Schottenstein filed his challenge to the Texas 1782, *id.*, Dkt. 13, which, as Orthogen demonstrated through its October 22, 2024 opposition brief, raises meritless arguments, *see id.*, Dkt. 15. Indeed, Dr. Schottenstein's two central arguments—that the Contemplated German Proceeding cannot provide the basis for a viable 1782 petition, *see id.* at 3-9, and that his and Orthogen's prior agreement to adjudicate their underlying disputes in Germany forecloses Orthogen from obtaining 1782 discovery, *see id.* at 10-19—run flatly counter to established 1782 law, *see id.* at 3-19.

Although nothing that has occurred in Texas precludes Orthogen from using the discovery produced to date by Ms. Chan and Mr. Lee in the Texas 1782 to support this Petition, in an abundance of caution, Orthogen is not referencing or relying on any of those documents here. As set forth below, even without considering those documents—or the documents and testimony the Caplas produced in the Florida 1782—this Petition is amply supported by (i) the information and documents that Ms. Chan and Mr. Lee provided to Orthogen *before Orthogen filed the Texas 1782*, and (ii) the verified allegations that Dr. Schottenstein included in his complaints in the N.Y. Action.

**D.   Through this Petition, Orthogen Seeks Discovery from Judith and Tomas Capla**

Orthogen is pursuing this Petition to obtain discovery from Judith and Tomas Capla relevant to its claims in the Contemplated German Proceeding—including documents identifying the full amount of Mr. Capla's share of the unreported Regenokine Program income that was paid to Judith and Tomas Capla. Such payments are highly relevant to Orthogen's damages claims, and the existence of such payments is strongly supported by (i) Dr. Schottenstein's first two verified Complaints in the N.Y. Action, in which he alleged that "[Mr.] Capla paid roughly two-thirds of his compensation to J. Capla and T. Capla, his parents, in order to shield this income and thereby avoid explanation as to why he qualified for this level of compensation" and "J. Capla and T. Capla deposited the portion of the compensation paid to them but allocated to [Mr.] Capla into a joint account in which [Mr.] Capla was a signatory able to withdraw this compensation," N.Y. Action, Dkt. 1 ¶¶ 78-79; Dkt. 24 ¶¶ 83-84; (ii) Mr. Capla's handwritten ledgers, as two of the seven exemplars provided by Ms. Chan and Mr. Lee reflect that a large portion of his share of the unreported Regenokine Program income was paid to Judith Capla, and (iii) Ms. Chan and Mr. Lee's recollection that a portion also was paid to Tomas Capla.

Orthogen respectfully submits that this Petition should be granted because (i) it meets the statutory requirements of Section 1782 (Orthogen has obtained evidence that Judith and Tomas Capla reside in this district, and the discovery sought is for use in a reasonably contemplated foreign proceeding to which Orthogen will be a party) and (ii) the discretionary factors that courts consider in determining whether to authorize Section 1782 discovery all favor granting the Petition (Judith and Tomas Capla will not be parties to the Contemplated German Proceeding, no reason exists to believe that a German court would be unreceptive to the requested discovery, the Petition is not an attempt to circumvent any proof-gathering restrictions of the German courts, and the discovery is not unduly burdensome).

## BACKGROUND

### A.    Dr. Schottenstein and Mr. Capla's Obligation to Report Regenokine Treatments and Revenue to Orthogen

Orthogen has developed various patented medical technologies, including the Regenokine Program. Kruger Decl. ¶¶ 2-3. To facilitate Regenokine Program patient treatments in the United States, Orthogen entered into license agreements with Mr. Capla and Dr. Schottenstein. *Id.* ¶ 4. Orthogen entered into one license agreement with Mr. Capla alone (in 2011) and three agreements with both Mr. Capla and Dr. Schottenstein (in 2012, 2013 and 2014) (each individually, an "Agreement," and collectively, the "Agreements"). *Id.* ¶¶ 5-6. The Agreements permitted Mr. Capla and Dr. Schottenstein to use the Regenokine Program in exchange for their agreement to make specified royalty payments to Orthogen. *Id.* ¶ 8.

Under the 2011, 2012, and 2013 Agreements, Orthogen was to be paid 40% of the net fees obtained by Dr. Schottenstein and Mr. Capla in connection with the Regenokine Program. *Id.* ¶ 9. Under the 2014 Agreement, Orthogen was to be paid a set dollar amount for each Regenokine Program patient treatment. *Id.* ¶ 10.

Under all four Agreements, Orthogen was to be provided regular reports setting forth, among other things, each Regenokine Program treatment administered to a patient within the reporting period, the amount of money invoiced to/paid by each patient in connection with the treatment(s), and the amount of money due to Orthogen in connection with each patient's treatment(s). *Id.* ¶ 11. The reports were to be accompanied by an affidavit attesting to the accuracy of the information in the reports. *Id.* ¶ 12. In practice, Mr. Capla was the one who provided the reports and affidavits.[9] *Id.* ¶ 13. Under the 2012, 2013, and 2014 Agreements, Mr.

---

[9] For all four Agreements, Mr. Capla signed both the reports and the affidavits that were provided to Orthogen. Kruger Decl. ¶ 13.

Capla and Dr. Schottenstein agreed that "[f]or any and all payments that are due under or in connection with th[e] Agreement[s], . . . [they would] be considered joint debtors." *Id.* ¶ 15. Each Agreement provides that German law governs any disputes arising under the Agreements, and that German courts have jurisdiction over any disputes. *Id.* ¶ 16.

During the period May 2011-May 2020 (the relevant period),[10] Mr. Capla's reports represented that a total of 1,325 Regenokine Program patient treatments were administered through NY Spine. *Id.* ¶ 18. Based on those reports, Orthogen invoiced and was paid a total of $6,303,300. *Id.* ¶ 19. Starting in December 2022, however, Orthogen obtained information—namely, allegations that Dr. Schottenstein made in his verified complaints in the N.Y. Action—that indicated that Mr. Capla's royalty reports contained false information.

### B.  Mr. Capla and Dr. Schottenstein Apparently Underreported Regenokine Program Patient Treatments and Associated Revenue to Orthogen

In Dr. Schottenstein's first three verified complaints in the N.Y. Action, he alleged that his practice provided Regenokine Program treatments to approximately "3,500 patients." Harwood Decl. ¶¶ 4-5. In his second and third verified complaints, Dr. Schottenstein alleged that he and Mr. Capla each earned "nearly $2 million per year" (from 2014 through 2020) from the patient treatments (after having alleged that they each had earned $6 million per year in his initial verified complaint). *Id.* ¶ 6.

If the foregoing verified allegations are true, it would mean that Mr. Capla and Dr. Schottenstein underpaid Orthogen millions in royalty fees. Indeed, taking only the 3,500 patients allegation, if true, it would mean that Orthogen was underpaid at least approximately $8 million in royalty fees, because (i) the lowest fee that Orthogen was to be paid for a single patient

---

[10] The first licensing agreement was entered into in May 2011, and the first royalty report was submitted to Orthogen in August 2011. Kruger Decl. ¶ 18 n.1.

treatment under the last of the parties' Agreements (the 2014 Agreement) was $4,000, Kruger

Decl. ¶ 22, and (ii) under the prior Agreements (the 2011, 2012 and 2013 Agreements), Orthogen

was to receive 40% of the net fees paid by patients, which, based on Mr. Capla's royalty reports

to Orthogen, worked out to an average of $4,840 per patient, *id.*, and therefore, (iii) even if each

of the 3,500 patients received only one treatment and the amount to which Orthogen was entitled

for the treatment was the minimum $4,000, that would mean that Orthogen should have been

paid about $14 million when, in actuality, it was paid only about $6 million, *id. See also id.* ¶ 23

(demonstrating that the nearly $2 million per year allegation, if true, likewise would mean that

Orthogen was underpaid millions of dollars).

　　　After alleging approximately 3,500 patients treated and nearly $2 million per year in

earnings in his second and third verified complaints, in his fourth (and current) verified

complaint, Dr. Schottenstein removed the two figures, but did not allege that the figures were

incorrect or replace them with new figures. *See* Harwood Decl. ¶ 7.

### C.　Ms. Chan and Mr. Lee Provided Orthogen With Information that Supports that It Was Defrauded and Underpaid by Mr. Capla and Dr. Schottenstein

　　　Orthogen has obtained information from Ms. Chan and Mr. Lee that supports that it was

defrauded and underpaid by Mr. Capla and Dr. Schottenstein. Ms. Chan worked at NY Spine

from 2012 to 2020, and Mr. Lee worked at NY Spine or for Dr. Schottenstein personally from

2015 to 2020. *Id.* ¶ 16 n.4.

　　　After Ms. Chan and Mr. Lee stopped working at NY Spine, Dr. Schottenstein sued them,

alleging that they had stolen millions of dollars from him. *See Schottenstein M.D., et al v. Lee et*

*al*, 1:22-cv-01197-DLC (S.D.N.Y.). The matter settled on March 26, 2024, with Ms. Chan and

Mr. Lee paying a total of $20,000. *See id.*, Dkt. 155. Prior to the settlement, Dr. Schottenstein

unsuccessfully moved for partial summary judgment. In connection with that briefing, Ms. Chan

and Mr. Lee filed publicly deposition testimony that addresses matters relevant to Orthogen's claims in the Contemplated German Proceeding. For example, the testimony touches on the amounts that Dr. Schottenstein and Mr. Capla charged Regenokine Program patients, with Ms. Chan testifying that, for "some of them . . . [,] it would be over a hundred thousand dollars." *See id.* Dkt. 107-2 at 104:20-24. None of Mr. Capla's royalty reports to Orthogen identified any patients being invoiced/paying $100,000, much less more than $100,000. Kruger Decl. ¶ 24.

1. <u>Ms. Chan and Mr. Lee Described Handwritten Ledgers Prepared by Mr. Capla With Information that Conflicts with Mr. Capla's Royalty Reports</u>

On April 3, 2024, counsel for Orthogen interviewed Ms. Chan and Mr. Lee (with their counsel present), during which Ms. Chan and Mr. Lee made statements that support that Dr. Schottenstein and Mr. Capla defrauded and underpaid Orthogen. Harwood Decl. ¶¶ 16-17. Among other things, Ms. Chan and Mr. Lee stated that (i) on a monthly basis, Mr. Capla prepared handwritten ledgers that were distinct from the royalty reports and contained three columns, "Patient," "Our Fee," and "Ger Fee"; (ii) the "Patient" column listed the name of each Regenokine Program patient who made a payment to NY Spine during the month covered by the ledger; (iii) the "Our Fee" column identified the total amount of money that each such patient paid to NY Spine that month; and (iv) the "Ger Fee" column identified the portion of the total amount (*i.e.*, the portion of the "Our Fee" amount) that was to be paid to Orthogen. *Id.* ¶ 17.

Ms. Chan and Mr. Lee stated that in some instances, for a particular patient and month, the ledgers reflected (i) "Our Fee" amounts in the hundreds of thousands of dollars, and (ii) corresponding "Ger Fee" amounts of $0. *Id.* ¶ 18. With respect to the "Our Fee" and "Ger Fee" amounts, Ms. Chan and Mr. Lee further stated that the ledgers (i) totaled the amounts in each of those columns, (ii) subtracted the total "Ger Fee" amount from the total "Our Fee" amount, and then (iii) identified the portion of the remainder of the "Our Fee" amount that was to be paid to

Dr. Schottenstein and the portion that was to be paid to Mr. Capla. *Id.* ¶ 19. Of the amounts identified as payable to Mr. Capla, Ms. Chan and Mr. Lee stated that those amounts were paid to an entity associated with Mr. Capla (called Molecular Cell), *but sometimes a portion was paid to one or the other of Mr. Capla's parents, Judith and Tomas Capla*. *Id*.

Based on Ms. Chan and Mr. Lee's descriptions of the ledgers, the amounts listed in the ledgers differ materially from the amounts listed in Mr. Capla's royalty reports. For example, the royalty reports do not reflect any individual patient as being invoiced more than $100,000. Kruger Decl. ¶ 24. In fact, most reflect invoiced amounts of $15,000 or less per patient. *Id*.

2.   Ms. Chan and Mr. Lee Provided Orthogen With Exemplar Ledgers

Following Ms. Chan and Mr. Lee's interview, they provided Orthogen with copies of the monthly ledgers for seven months: October 2017, January 2018, March 2018, February 2019, March 2019, June 2019, and August 2019. Harwood Decl. ¶ 20 & Exs. I-O. The seven ledgers confirm what they said during their interview and reflect underpayments to Orthogen.

According to the royalty reports for these seven months, Dr. Schottenstein and Mr. Capla invoiced the relevant Regenokine Program patients a total of $492,500 of which $197,000 was to be paid to Orthogen as royalty fees, leaving at most $295,500 to be paid to Dr. Schottenstein and Mr. Capla. *Id.* ¶ 21. By contrast, according to the ledgers, during these same seven months, the relevant Regenokine Program patients paid a total of $2,518,000 (identified as "Our Fees"), of which $206,000 was identified as the "Ger Fees" and $60,220 was identified as payable to Dr. Michael Neely (a doctor who assisted in administering Regenokine Program treatments to NY Spine patients), leaving $2,251,780 to be paid to Dr. Schottenstein and Mr. Capla.[11] *Id*. Thus, the

---

[11] The above figures, as well as the other figures from the ledgers presented herein (unless otherwise noted), exclude the fees paid by the patients whom the ledgers identify as having paid only $500, because Orthogen understands that the $500 payments were for a Regenokine Program consultation rather than a Regenokine Program treatment. The

ledgers reflect that Dr. Schottenstein and Mr. Capla received many more times the amount that the royalty reports indicated they would receive.[12]

The seven ledgers also reflect that numerous patients received Regenokine Program treatments (and paid large amounts to NY Spine in connection with those treatments) for whom no royalties were paid to Orthogen. *Id.* ¶ 23. In particular, the seven ledgers reflect a total of 18 instances where (i) the "Our Fees" column reflects the patients paying tens and sometimes hundreds of thousands of dollars to NY Spine, but (ii) Orthogen was not allocated any fees in the corresponding "Ger Fee" column. *Id.* The underlying Regenokine Program treatments appear not to have been reported to Orthogen,[13] and therefore not to have resulted in any royalty payments to Orthogen. *Id.* Nevertheless, based on the ledgers, Mr. Capla and Dr. Schottenstein received at least $605,000 (and likely more) in connection with those treatments. *Id.* ¶ 23 & n.8.

*In addition, two of the ledgers—for January 2018 and March 2018—reflect that Mr. Capla's mother, Judith Capla, received portions of the Regenokine Program money that had been allocated to Mr. Capla. Id.* ¶ 25. The January 2018 ledger reflects that a total of $237,500[14]

---

$500 payments are not material, however, as they total only $3,000; therefore, including the $500 payments raises the above figures to $2,521,000 and $2,254,780, respectively. Harwood Decl. ¶ 21.

[12] When looking at the seven months covered by the ledgers individually, the differences between the ledgers and the royalty reports are equally stark. For example, the October 2017 ledger reflects that 10 patients received Regenokine Program treatments, and paid a total of $637,000 for those treatments (the sum of the amounts in the "Our Fee" column)—with one of the 10 having paid $300,000 and another having paid $120,000. Harwood Decl. ¶ 22. By contrast, the October 2017 royalty report reflects 9 patients as having received Regenokine Program treatments, and identifies them as having been invoiced a total of only $107,500. *Id.* Each of those 9 patients is identified as having been invoiced $15,000 or less. *Id.*

[13] The lack of reporting to Orthogen is supported by comparing the seven monthly ledgers to the corresponding monthly royalty reports. For example, as noted above, the October 2017 ledger includes 10 Regenokine Program patients whereas the October 2017 royalty report includes 9 Regenokine Program patients. Harwood Decl. ¶ 24. Of the 10 patients on the ledger, one has a $0 allocation for the "Ger Fee." *Id.* Comparing the ledgers to the royalty reports for the other six months reveals a similar discrepancy: for each ledger, the number of Regenokine Program patients exceeds the number of patients in the corresponding royalty report either by the same or a greater number of patients for whom $0 was allocated for the "Ger Fee." *Id.*

[14] The ledgers do not specify how Mr. Capla and Dr. Schottenstein allocated the $500 consultation fees among themselves, and therefore the figures in this paragraph include those fees. Harwood Decl. ¶ 26 n.9.

was paid by Regenokine Program patients (the total of the "Our Fee" column), of which (after subtracting out the total of the "Ger Fee" column ($30,000) plus an additional amount identified as owed to Dr. Neely ($7,500)) "Ed" (Mr. Capla) was to receive $110,049.36 and "Doug" (Dr. Schottenstein) was to receive $89,950.64. *Id.* ¶ 26. Of "Ed['s]" portion, the ledger reflects that $73,366.24 was to be paid to Molecular Cell (Mr. Capla's entity) and $37,516.45 was to be paid to Judith Capla—approximately one-third of the total amount allocated to Mr. Capla. *Id.* The March 2018 ledger reflects a similar calculation: Judith Capla is identified as receiving approximately one-third ($68,916.45) of the $204,249.36 allocated to Mr. Capla out of a total of $392,000 in payments from Regenokine Program patients. *Id.* ¶ 27.

Although none of the seven ledgers that Orthogen received from Ms. Chan and Mr. Lee before filing the Texas 1782 reflect payments to Tomas Capla, as noted above, Ms. Chan and Mr. Lee stated when interviewed that Tomas Capla received such payments. Moreover, in Dr. Schottenstein's first two verified Complaints in the N.Y. Action, he asserted that both Judith and Tomas Capla were paid money that had been allocated to Mr. Capla, stating: *"[Mr.] Capla paid roughly two-thirds of his compensation to [] J. Capla and T. Capla, his parents, in order to shield this income and thereby avoid explanation as to why he qualified for this level of compensation,"* and *"J. Capla and T. Capla deposited the portion of the compensation paid to them but allocated to [Mr.] Capla into a joint account in which [Mr.] Capla was a signatory able to withdraw this compensation,"* N.Y. Action, Dkt. 1 ¶¶ 78-79; Dkt. 24 ¶¶ 83-84.

Consistent with Dr. Schottenstein's allegations, before Orthogen filed the Texas 1782, Ms. Chan and Mr. Lee provided Orthogen with a few text message exchanges between either Ms. Chan and Dr. Schottenstein or Ms. Chan and Mr. Capla that on their face reflect attempts to obscure the amount that Mr. Capla was receiving. One of those exchanges references money

being paid to Judith Capla. In that exchange, Dr. Schottenstein wrote the following to Ms. Chan:

> We might need to pay capla thru one other doctor who works for us depending on how much capla is due to make bc it has to be fair market value. You can give some of Caplas money to Yoli but not much bc she's a medical asst. but maybe since rgk is making a little less, it could be ok with just capla *and his mom* and extra to Yoli (not extra money but getting more of caplas money paid to her).

Harwood Decl. Ex. W (emphasis added).

### D.  The Information Obtained Thus Far from Ms. Chan and Mr. Lee Supports that Orthogen Was Defrauded and Underpaid

Mr. Capla's handwritten ledgers indicate that Orthogen was defrauded in at least two ways: (i) Dr. Schottenstein and Mr. Capla received payments from Regenokine Program patients in connection with Regenokine Program treatments without making any royalty payments to Orthogen, and without including the patients' treatments in Mr. Capla's royalty reports, and (ii) for those treatments that were included in the royalty reports, the reports vastly understated the amount that those patients were invoiced/paid.

With respect to the first apparent fraud, regardless of whether Orthogen was entitled to 40% of the net profits from the omitted treatments (per the 2011, 2012 and 2013 Agreements) or a specified dollar amount for each of the omitted treatments (per the 2014 Agreement), Dr. Schottenstein and Mr. Capla's apparent failure to make any royalty payments to Orthogen whatsoever for the omitted treatments means that Orthogen was denied the full royalties to which it was entitled. Kruger Decl. ¶ 27.

With respect to the second apparent fraud, the conduct means that, for those treatments that were reported to it, Orthogen was entitled to additional royalties. For the years in which Orthogen was entitled to 40% of the net profits in connection with the treatments (the years covered by the 2011, 2012, and 2013 Agreements), Orthogen apparently did not receive the full amount of royalties owed because Orthogen based its invoices to Dr. Schottenstein and Mr.

Capla on the reduced amounts that Mr. Capla included in the royalty reports. *Id.* ¶ 28.

For the years in which Orthogen was entitled to a specified dollar amount for each Regenokine Program patient treatment (the years covered by the 2014 Agreement), Orthogen was fraudulently induced to agree to a lower per-treatment dollar amount than it would have insisted upon had it known the actual amounts that Dr. Schottenstein and Mr. Capla were invoicing and being paid by the Regenokine Program patients. *Id.* ¶ 29.[15] Orthogen's German counsel has confirmed that, if proven, the first fraud would support claims in Germany for breach of contract and fraud, and the second fraud would support a claim in Germany for fraudulent inducement. *Id.* ¶ 31.

### E.  Judith and Tomas Capla Possess Information that Orthogen Needs and Intends to Use in the Contemplated German Proceeding

For its Contemplated German Proceeding against Dr. Schottenstein and Mr. Capla, Orthogen seeks authorization to issue subpoenas for documents to Judith and Tomas Capla, including documents reflecting the payments they received from N.Y. Spine, which Orthogen will use to (i) corroborate the information regarding such payments in the handwritten ledgers, and (ii) calculate its damages in the Contemplated German Proceeding. *See* Kruger Decl. ¶ 43. It does not appear that Orthogen will be able to obtain from other sources a full accounting of the Regenokine Program-related payments that Judith and Tomas Capla received—based on statements that Dr. Schottenstein and Mr. Capla have made in court filings, they appear to have destroyed or failed to retain relevant Regenokine Program payment records, *see infra* at 19— and, thus, Judith and Tomas Capla's records of such payments will be crucial to enable Orthogen

---

[15] Had Orthogen understood that Dr. Schottenstein and Mr. Capla were invoicing Regenokine Program patients far more than the amounts identified in Mr. Capla's royalty reports, before entering into the 2014 Agreement, Orthogen would have insisted that the payment provision be adjusted to provide for it to receive far more than the per-treatment amount to which it ultimately agreed so that its royalty payments would have been commensurate with what Dr. Schottenstein and Mr. Capla had been invoicing and receiving. Kruger Decl. ¶ 30.

to perform a full damages analysis. *See id.* ¶¶ 43-45. Orthogen also seeks any documents that Judith and Tomas Capla may possess relevant to the number and nature of the Regenokine Program treatments provided through NY Spine, the amounts patients were invoiced/paid for such treatments, and the representations that were made to Orthogen about those topics.

Orthogen also seeks authorization to issue subpoenas for testimony to Judith and Tomas Capla to enable it to (i) question them about and authenticate the financial records and any other documents they may produce, (ii) question them about Dr. Schottenstein's verified allegations that "[Mr.] Capla paid roughly two-thirds of his compensation to J. Capla and T. Capla, his parents, in order to shield this income and thereby avoid explanation as to why he qualified for this level of compensation," and that "J. Capla and T. Capla deposited the portion of the compensation paid to them but allocated to [Mr.] Capla into a joint account in which [Mr.] Capla was a signatory able to withdraw this compensation," N.Y. Action, Dkt. 1 ¶¶ 78-79; Dkt. 24 ¶¶ 83-84, and (iii) fully explore their knowledge relevant to Dr. Schottenstein and Mr. Capla's apparent underreporting of Regenokine Program patient treatments and revenue.

Because Judith and Tomas Capla conceivably could possess relevant documents that contain information protected by the Health Insurance Portability and Accountability Act ("HIPAA"), such as patient names, in addition to seeking authorization to issue subpoenas to Judith and Tomas Capla for documents and testimony (in the form attached hereto as Exhibits B and C), Orthogen also requests that this Court enter a HIPAA Order (in the form attached hereto as Exhibit D), which will enable Judith and Tomas Capla to produce all relevant documents they may possess without any HIPAA-related redactions.

The discovery sought here from Judith and Tomas Capla is warranted because (i) Dr. Schottenstein's prior verified allegations in the N.Y. Action and the statements made/documents

provided by Ms. Chan and Mr. Lee all support that Mr. Capla caused a large portion of his undisclosed Regenokine Program money to be paid to Judith and Tomas Capla, and thus (ii) documents and testimony from them will be crucial to allow Orthogen to fully pursue its claims and damages in the Contemplated German Proceeding.

Discovery from Judith and Tomas Capla is particularly important because Mr. Capla did not produce in the Florida 1782 the handwritten ledgers that were provided by Ms. Chan and Mr. Lee, and Mr. Capla and Dr. Schottenstein have been pointing the finger at each other with respect to which of them possesses relevant Regenokine Program records, including relevant financial records. In a declaration in the Florida 1782, Mr. Capla attested that Dr. Schottenstein's practice possesses the relevant Regenokine Program records, including financial records regarding Regenokine Program-related payments, Harwood Decl. Ex. Y at ¶¶ 16, 24, but in his fourth verified complaint in the N.Y. Action (his operative complaint), Dr. Schottenstein attested that Mr. Capla withdrew the relevant records from NY Spine, namely, "all records, financial and otherwise, concerning the Regenokine practice." N.Y. Action, Dkt. 93 ¶ 225.

The discovery Orthogen has obtained to date, and the additional discovery it seeks here and in the Texas 1782, does not, however, obviate the need for discovery from Dr. Schottenstein in the pending N.Y. 1782 for a variety of reasons, including because: (i) Dr. Schottenstein's Regenokine Program patient records (which Mr. Capla did not produce in the Florida 1782 and Dr. Schottenstein must still possess) should enable Orthogen to identify the full scope of the unreported Regenokine Program patients and treatments, (ii) Dr. Schottenstein should possess financial information reflecting at least the excess amounts he received beyond what would have been appropriate had the representations in Mr. Capla's royalty reports been true, (iii) Dr. Schottenstein alleged in his current verified pleading in the N.Y. Action that Mr. Capla is to

19

blame for any false reporting or underpayments to Orthogen, *see* N.Y. Action, Dkt. 93 ¶¶ 142-46, and thus discovery (including testimony) from him is critical to test this assertion, and (iv) as Dr. Schottenstein's German counsel has acknowledged in the Texas 1782, a German plaintiff should have all pertinent evidence in hand at the time civil litigation for damages is initiated, *see* Texas 1782, Dkt. 13-9 ¶¶ 14, 18; Kruger Decl. ¶ 49 (Orthogen's German counsel reiterating this point); *see also* Texas 1782, Dkt. 15-1 ¶ 5 (same).

## ARGUMENT

Orthogen's Section 1782 Petition should be granted because (i) it meets the statutory requirements of Section 1782, *infra* Part I, and (ii) all the factors to be considered by the Court in exercising its discretion under Section 1782 favor the Petition, *infra* Part II.

## I.    THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782

To obtain discovery under Section 1782, an applicant must show that (i) the person from whom discovery is sought "resides or is found in" the district where the application is brought; (ii) the discovery sought is for "use" in a foreign proceeding; and (iii) the application is made by an "interested person" or foreign tribunal. *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) (citing *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015)). Orthogen's application meets each of these requirements.

### A.    Judith and Tomas Capla Reside and/or Are Found in this District

Orthogen satisfies the first statutory requirement because this Court has personal jurisdiction over Judith and Tomas Capla. A court's authority to authorize discovery under Section 1782 extends to any "person" who "resides or is found in" the district. 28 U.S.C. § 1782(a). A person "resides or is found in" this district if this Court can exercise personal jurisdiction over him or her. *See In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019).

20

This Court has personal jurisdiction over Judith and Tomas Capla because, based on the documents described in the Harwood Declaration, they maintain their primary residence and domicile in this district. *See* Harwood Decl. ¶¶ 36-39 (describing property assessment, licensing, and other records indicating that Judith and Tomas Capla's primary residence is in the Bronx, New York). *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

### B.   The Discovery Sought Is for Use in a Foreign Proceeding

Orthogen satisfies the second statutory requirement, because it seeks the requested discovery for "use in a proceeding in a foreign . . . tribunal." 28 U.S.C. § 1782. The Supreme Court has made clear that the foreign proceeding need not be pending; it need only "be within reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). To be within reasonable contemplation, "the applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated." *Certain Funds*, 798 F.3d at 123; *see, e.g.*, *In re Zouzar Bouka; Vision Indian Ocean S.A.*, 637 F. Supp. 3d 74, 84-85 (S.D.N.Y. 2022); *BANOKA, S.à.r.l. v. Alvarez & Marsal Inc.*, 2024 WL 1242994, at *6 (S.D.N.Y. Mar. 22, 2024).

Here, Orthogen has provided ample objective indicia that the relevant foreign proceeding in fact is "within reasonable contemplation." Orthogen has retained German counsel who, through his declaration submitted herewith, has demonstrated that (i) Orthogen has a strong evidentiary basis to allege that it was defrauded and underpaid royalties by Mr. Capla and Dr. Schottenstein (including based on the ledgers obtained from Ms. Chan and Mr. Lee and Dr. Schottenstein's verified allegations in the N.Y. Action), (ii) the evidence Orthogen possesses supports claims for breach of contract and fraud under German law, and (iii) Orthogen has taken concrete steps to bring the Contemplated German Proceeding, including drafting the pleadings and adjusting them based on the evidence obtained to date. Kruger Decl. ¶ 32. Othogen's

German counsel also has confirmed that he will be filing the Contemplated German Proceeding. *Id.* Where, as here, the applicant has "retained [local] counsel," who "has begun preparing the necessary pleadings," "provided declarations expressing intent to initiate" the foreign proceeding, and "set forth a theory of liability," courts find sufficient objective indicia that the foreign proceeding is within reasonable contemplation. *In re Kuwait Ports Auth.*, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021); *see Zouzar*, 637 F. Supp. 3d at 85-87 (same).

Further, the burden imposed by 1782's "for use" requirement is very low; the party seeking discovery need only show that the discovery will "be employed with some advantage . . . in the proceeding." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015). Here, Orthogen will use the discovery it seeks to its advantage: at a minimum, to identify the full amount of unreported Regenokine Program income that was allocated to Mr. Capla, but paid to Judith and Tomas Capla, which it will use to show the full extent to which it was damaged. Kruger Decl. ¶¶ 33, 43.

### C.  Orthogen Is an "Interested Person" for Purposes of the Foreign Proceeding

Orthogen also satisfies Section 1782's final statutory requirement because it will be the plaintiff in the Contemplated German Proceeding, and thus it qualifies as an "interested person" under the statute. *Intel*, 542 U.S. at 256; *Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996).

## II.    THE FOUR DISCRETIONARY FACTORS FAVOR THE PETITION

When, as here, the statutory requirements are met, courts also consider four discretionary factors in deciding whether to grant Section 1782 discovery, each of which also is met:

> (1) whether "the person from whom the discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the § 1782 application contains "unduly intrusive or burdensome" discovery requests.

*In re Aso*, 2019 WL 3244151, at *1 (S.D.N.Y. July 19, 2019) (quoting *Intel*, 542 U.S. at 264-65).

22

### A.  Judith and Tomas Capla Will Not Be Parties to the Foreign Proceeding

Judith and Tomas Capla will not be parties to the Contemplated German Proceeding, Kruger Decl. ¶ 34, and thus the first discretionary factor supports granting this Petition—particularly because they possess documents and information that (i) Orthogen needs to conduct a full damages analysis (*i.e.*, financial records reflecting the full amount of income allocated to Mr. Capla, but paid to his parents), and (ii) can be used to authenticate key evidence (at a minimum, the payments to Judith Capla reflected in the handwritten ledgers). *Intel*, 542 U.S. at 264 (first factor favors discovery of non-parties); *see Zouzar*, 637 F. Supp. 3d at 87-88 (same).

### B.   A German Court Likely Would Be Receptive to the Requested Discovery

In considering the second factor, when, as here, the petitioner has submitted a declaration from its foreign counsel stating that such counsel has no reason to believe that the foreign court would reject or otherwise decline to consider the discovery, *see* Kruger Decl. ¶ 46, courts require "authoritative proof that [the] foreign tribunal would reject [the] evidence obtained with the aid of section 1782" before finding that this factor weighs against granting a Section 1782 application. *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *see In re Iraq Telecom Ltd.*, 2019 WL 3798059, at *4 (S.D.N.Y. Aug. 13, 2019) ("In the absence of specific evidence that the [foreign courts and arbitral forums] would reject Petitioner's requested discovery, this second factor also weighs in favor of granting the application.").

Here, Orthogen's German counsel confirms that he (i) is "not aware of any German laws or restrictions that would preclude Orthogen from seeking or obtaining through Section 1782 the discovery it seeks here," and (ii) has no "reason to believe that a German court would reject or otherwise decline to consider the [discovery]." Kruger Decl. ¶ 46. Consistent with the foregoing, "a substantial amount of case law [exists] where courts have found that German commercial courts are an appropriate forum for § 1782 assistance," *Kang v. Nova Vision, Inc.*, 2007 WL

1879158, at *2 (S.D. Fla. June 26, 2007), and U.S. courts "routinely grant Section 1782 applications for proceedings in Germany," *In re Hansainvest*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018). The above-cited law—together with the same representations that Orthogen's German counsel has made here—led the Florida 1782 court to hold that this factor favored 1782 discovery of the Caplas, *see* Florida 1782, Dkt. 38 at 19-20, and no reason exists for a different result here. *See In re Application of Johannes Roessner*, 2021 WL 5042861, at *3 (S.D.N.Y. Oct. 29, 2021) (second factor favored petition where, as here, German counsel stated that he was "not aware of any German laws or restrictions that would preclude the use of the discovery sought").

### C.   Orthogen Is Not Circumventing Any German Proof-Gathering Restrictions

The third factor weighs against the applicant only when the application was brought in "bad faith." *See In re Application of Hill*, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007). Accordingly, "[o]nly where the materials being sought are privileged or otherwise prohibited from being discovered or used [by a rule of the foreign jurisdiction] is the third *Intel* factor implicated." *In re Tiberius Grp. AG*, 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020); *see, e.g.*, *Mees*, 793 F.3d 291, 303 n.20 (narrower foreign discovery rules do not impact third *Intel* factor, which counsels against discovery only when foreign rules exist "akin to privileges that *prohibit* the acquisition or use of certain materials" (emphasis in original)).

That German discovery is more limited compared to the United States thus does not affect the analysis. *See In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79-80 (2d Cir. 1997) (fact that German court "would not [] afford[]" the "kind of discovery" did not warrant denying 1782 petition). Indeed, "courts routinely grant § 1782 applications where [as here] the discovery sought might not be available in the foreign legal system, but is not explicitly prohibited from being acquired" through Section 1782. *Tiberius*, 2020 WL 1140784, at *5.

Here, no German authority exists precluding Orthogen from obtaining the requested discovery, and no reason exists to believe that a German court would reject the discovery. *See* Kruger Decl. ¶¶ 46-48. Indeed, the Florida 1782 court held that Orthogen's position "that a German court would accept [1782 discovery] . . . carries the day." *In re: Orthogen Int'l GmbH*, 2023 WL 6813223, at * 10 (S.D. Fla. Oct. 16, 2023). The third factor thus favors the discovery.

### D. Orthogen's Discovery Requests Are Not Unduly Burdensome

The fourth factor also favors the discovery because (i) Orthogen's discovery requests are narrowly tailored and not "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, and (ii) the discovery sought is relevant to the Contemplated German Proceeding, *see In re Bayerische Motoren Werke AG*, 2022 WL 2817215, at *6 (S.D.N.Y. July 19, 2022) (requests seeking documents and testimony for relevant time period not unduly burdensome). Indeed, the proposed subpoenas are focused on matters central to Orthogen's anticipated claims: the payments that Judith and Tomas Capla received in connection with the Regenokine Program, and (to the extent they possess such information) the nature and number of Regenokine Program treatments provided, the amounts invoiced to patients/received by Dr. Schottenstein and Mr. Capla in connection with the treatments, and any representations they made to Orthogen about the above.

### <u>CONCLUSION</u>

Accordingly, Orthogen respectfully requests that the Court endorse the Proposed Order granting the Petition, annexed hereto as Exhibit A, as well as the proposed HIPAA Order annexed hereto as Exhibit D.

Dated: October 31, 2024

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.

*/s/ Chrisopher B. Harwood*
Christopher B. Harwood
Matthew Garry
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com
mgarry@maglaw.com

*Attorneys for Petitioner Orthogen
International GmbH*

26