**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF ORTHOGEN     :
INTERNATIONAL GMBH,                   :
                                      :    Case No. 1:24-mc-00504-VSB
             Petitioner,        :
                                        :
for an order pursuant to 28 U.S.C. § 1782 to    :
conduct discovery for use in a foreign        :
proceeding.                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PETITIONER'S RESPONSE IN OPPOSITION TO MOTION TO INTERVENE AND TO INTERPOSE A PLEA IN INTERVENTION WITH COUNTERCLAIMS**

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.
Christopher B. Harwood
Matthew Garry
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com
mgarry@maglaw.com

*Attorneys for Petitioner Orthogen*
*International GmbH*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 6

A.    Orthogen Licenses the Regenokine Program to Dr. Schottenstein and Mr. Capla .............. 6

B.    Dr. Schottenstein Reveals That He and Mr. Capla Defrauded Orthogen .......................... 7

C.    Orthogen Pursues Additional Discovery After Obtaining More Evidence ........................ 9

D.    Orthogen Has Obtained Substantial Evidence of Fraudulent Underreporting and
Underpayment ...................................................................................................................... 10

E.    Prompt Resolution Is Needed ........................................................................................... 12

ARGUMENT ............................................................................................................................ 13

I.    The License Agreements' German Forum Selection Clause Does Not Render the Petition
Improper .................................................................................................................................. 14

IV.    The Schottenstein Parties' As-Applied Constitutional Challenge Fails ............................ 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*,
    571 U.S. 49 (2013) ........................................................................................................Passim

*Banoka v. Westmount Int'l Dev. Inc.*,
    2022 WL 480118 (S.D. Tex. Feb. 10, 2022) ............................................................... 19

*Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*,
    798 F.3d 113 (2d Cir. 2015) .............................................................................. 21, 22

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) ...................................................................................... 24

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) .................................................................................................. 25

*Heller v. Doe by Doe*,
    509 U.S. 312 (1993) .................................................................................................. 25

*In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*,
    2024 WL 555780, (S.D.N.Y. Jan. 18, 2024) ....................................................... 14, 17

*In re Cal. State Teachers' Ret. Sys.*,
    2017 WL 1246349 (D.N.J. Apr. 3, 2017)....................................................... 15, 17, 18

*In re Hansainvest Hanseatische Inv.-GmbH*,
    364 F. Supp. 3d 243 (S.D.N.Y. 2018) ...................................................................... 22

*In re Kuwait Ports Auth.*,
    2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) .......................................................... 22

*In re Polymer Solutions Int'l, Inc.*,
    2019 WL 1239778 (D. Md. Mar. 18, 2019) ....................................................... 15, 18

*In re Porsche Automobil Holding S.E.*,
    2021 WL 2530277 (S.D.N.Y. June 21, 2021) .......................................................... 24

*In re Thales Dis Ais Deutschland GmbH*,
   2021 WL 7707268 (N.D. Tex. Nov. 5, 2021) .......................................................... 17

*In re Tiberius Grp. AG*,
   2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020).......................................................... 15

*In re Zouzar Bouka; Vision Indian Ocean S.A.*,
   637 F. Supp. 3d 74 (S.D.N.Y. 2022) .................................................................... 22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ...............................................................................Passim

*Kadrmas v. Dickinson Public Schools*,
   487 U.S. 450 (1988) ......................................................................................... 25

*Kamerman v. Steinberg*,
   681 F. Supp. 206 (S.D.N.Y. 1988) ..................................................................... 13

*Kang v. Nova Vision, Inc.*,
   2007 WL 1879158 (S.D. Fla. June 26, 2007).......................................................... 17

*Kirkland v. New York State Dept. of Corr. Servs.*,
   711 F.2d 1117 (2d Cir. 1983) ............................................................................. 13

*Mees v. Buiter*,
   793 F.3d 291 ................................................................................................... 15

*United States v. Amalfi*,
   47 F.4th 114 (2d Cir. 2022) ............................................................................... 25

*Venequip, S.A. v. Mustang Mach. Co.*,
   2022 WL 3951173 (S.D. Tex. Aug. 30, 2022) ...................................................... 18

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012) .............................................................................. 25

**Statutes**

28 U.S.C. § 1782.................................................................................*passim*

**Other Authorities**

C. Wright & A. Miller, Federal Practice & Procedure, § 1921 (3d ed.) ....................................... 13

Orthogen International GmbH ("Orthogen") submits this memorandum of law, along with a supplemental declaration of Dr. Stefan Kruger ("Supp. Kruger Decl."), in response to the motion filed by Dr. Douglas Schottenstein and his medical practice ("NY Spine," and together with Dr. Schottenstein, the "Schottenstein Parties") to (i) intervene in this proceeding—which Orthogen brought pursuant to 28 U.S.C. § 1782 to obtain discovery from Judith and Tomas Capla, who have not objected, for use in a lawsuit it will be bringing in Germany against Dr. Schottenstein and his co-licensee for Orthogen's Regenokine Program, Edward Capla (the "Contemplated German Proceeding")—and (ii) interpose five counterclaims (the "Proposed Counterclaims").

Orthogen does not object to the Schottenstein Parties intervening in order to participate in any discovery that this Court authorizes, but it does object to their request to interpose the Proposed Counterclaims on the ground that they are contrary to settled law and thus interposing them would be futile.

## PRELIMINARY STATEMENT

Through this 1782 action, Orthogen seeks discovery from Judith and Tomas Capla for use in the Contemplated German Proceeding. Although glossed over in the Schottenstein Parties' Proposed Counterclaims, 1782 applicants must show that (i) they satisfy the three requirements set forth in the 1782 statute and (ii) on balance, the four discretionary factors identified in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), favor the discovery sought.

As Orthogen demonstrated in its 1782 application here (the "Petition"), the three statutory factors are met because (i) Judith and Tomas Capla reside in this district, (ii) the requested discovery is for use in the Contemplated German Proceeding, and (iii) Orthogen is an "interested person" as to the Contemplated German Proceeding because it will be the plaintiff.

1

Dkt. 5 at 20-22. Orthogen's Petition also showed that each the four *Intel* factors supports the discovery it seeks because (i) Judith and Tomas Capla will not be parties to the Contemplated German Proceeding, (ii) German courts are receptive to evidence obtained through 1782, (iii) the Petition is not an attempt to circumvent any proof-gathering restrictions in Germany, and (iv) the requested discovery is not unduly burdensome. *Id.* at 22-25.

Judith and Tomas Capla have not objected to the Petition; only the Schottenstein Parties have. But instead of raising their objections in the usual way—through a motion to quash—they have raised them in their Proposed Counterclaims. Specifically, the Proposed Counterclaims raise—and are premised on—four objections to the Petition:

- the first and second Proposed Counterclaims are premised on the Schottenstein Parties' incorrect assertion that the German forum selection clause in the license agreements between Orthogen, Dr. Schottenstein, and Edward Capla ("Mr. Capla") supposedly precludes Orthogen from seeking 1782 discovery, Dkt. 15-2 ¶¶ 101-111;

- the third Proposed Counterclaim is premised on their incorrect assertion that a 2013 Supreme Court decision, *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49 (2013), supposedly renders the *Intel* factors irrelevant here and requires the Court to apply a different set of factors that purportedly counsel against the discovery sought, *id.* ¶¶ 112-121;

- the fourth Proposed Counterclaim is premised on the Schottenstein Parties' incorrect assertion that Orthogen supposedly cannot satisfy 1782's second statutory requirement because it has not shown that the filing of the Contemplated German Proceeding is sufficiently imminent, *id.* ¶¶ 123-132; and

- the fifth Proposed Counterclaim is premised on their incorrect assertion that

2

permitting Orthogen to obtain discovery from Judith and Tomas Capla somehow would violate the Schottenstein Parties' constitutional rights, *id.* ¶¶ 133-142.

The Schottenstein Parties presumably took the unusual approach of filing their Proposed Counterclaims rather than a motion to quash because (i) a motion to quash would have required them to address each statutory and *Intel* factor, and (ii) they know that an analysis of those factors favors the Petition. In any event, as explained below, the four assertions underlying the Proposed Counterclaims are contrary to settled law, and therefore the Schottenstein Parties' request for leave to interpose them should be denied as futile.

With respect to the first and second Proposed Counterclaims, courts treat the existence of a forum selection clause as a matter to be considered under the third *Intel* factor, not as precluding 1782 discovery. When, as here, the forum selection clause (i) speaks only to where and under what law the parties' underlying dispute will be resolved, (ii) does not address what proof-gathering tools the parties may use to gather relevant evidence (much less preclude the use of 1782), and (iii) selects a forum whose courts, in applying the selected law, have demonstrated a receptiveness to 1782 discovery (like Germany), the third *Intel* factor favors 1782 discovery.

With respect to the third Proposed Counterclaim, *Atlantic Marine* has no relevance to the 1782 analysis; in the 12 years since it was decided, no court has even suggested that it might apply in the 1782 context. With respect to the fourth Proposed Counterclaim, *Intel* and Second Circuit precedent make clear that 1782 discovery is available for use in foreign proceedings that, like the Contemplated German Proceeding, have been shown through sworn declarations to be "within reasonable contemplation," 542 U.S. at 259. Finally, with respect to the fifth Proposed Counterclaim, even if the Schottenstein Parties had standing to assert a constitutional challenge to the 1782 statute in this proceeding (they do not), the statute would easily survive the challenge

under rational basis review (which they concede is the appropriate standard of review).

Accordingly, although Orthogen does not object to the Schottenstein Parties intervening to participate in any discovery that the Court may authorize, their Proposed Counterclaims are based on unsustainable assertions, and therefore their request to interpose them should be denied. Notably, as support for their fourth Proposed Counterclaim, the Schottenstein Parties improperly seek to leverage the fact that Orthogen's separate petition to obtain 1782 discovery from them (the "Schottenstein 1782") has been pending before this Court for nearly two years.[1] For good reason (as set forth below), Orthogen has been waiting for this Court to decide the Schottenstein 1782 before bringing the Contemplated German Proceeding. The Schottenstein Parties, however, improperly seek to use Orthogen's justified waiting to argue that (i) Orthogen's May 2023 statement in the Schottenstein 1782 that it intended to bring the Contemplated German Proceeding was not true when made, (ii) the statement is not true now, and (iii) Orthogen "has no claims [to pursue] against the Schottenstein Parties." Dkt. 15-2 ¶¶ 90-94.

As Orthogen detailed in its Petition here, and as Dr. Stefan Kruger (Orthogen's German counsel) further explains in his supplemental declaration (submitted herewith), Orthogen will be bringing claims against Dr. Schottenstein and Mr. Capla in the Contemplated German Proceeding, and has ample support for its claims. Based on Dr. Schottenstein's admissions in the separate action he brought and then dismissed against Orthogen in this district (the "N.Y. Action"),[2] as well as the information that Orthogen has obtained to date both through informal evidence-gathering efforts and its other 1782 petitions (the "Florida 1782" and the "Texas

---

[1] The Schottenstein 1782 is captioned *In Re: Orthogen International GmbH*, No. 1:23-mc-00152-VSB.

[2] The N.Y. Action is captioned *In re Orthogen International GmbH*, No. 1:23-mc-00152-VSB (S.D.N.Y.).

1782"),[3] Orthogen has compelling evidence that Dr. Schottenstein and Mr. Capla intentionally underreported Regenokine Program patients and treatments during the period covered by the parties' license agreements and, as a result, substantially underpaid royalties to Orthogen. Orthogen also has shown that the underreporting and underpayments support the specific claims that it will bring in the Contemplated German Proceeding. *See* Supp. Kruger Decl. ¶¶ 18-25.

   As Dr. Kruger explains in his supplemental declaration, Orthogen has not yet brought the Contemplated German Proceeding because it has been waiting for this Court to decide the Schottenstein 1782. *Id.* ¶ 26. That is because (i) without the discovery that Orthogen seeks from the Schottenstein Parties through the Schottenstein 1782 (most notably, the Regenokine patient treatment records), it does not have records sufficient to identify the *full scope* of the underreporting/underpayments, (ii) as a result, if it brought the Contemplated German Proceeding now, it would have to present an extrapolated analysis of its damages in its complaint (it could specify its damages with respect to the many patients for whom it has obtained specific evidence identifying specific underreporting and underpayments, but it would have to use that evidence to present an extrapolated damages analysis to cover the remainder of the patient population), (iii) a risk exists that if Orthogen were to file suit now and seek damages based on an extrapolated analysis, the German court would award a portion of the damages sought (*e.g.*, the damages associated with the specific patients for whom it has obtained specific evidence of underreporting and underpayments), but not the full amount (*e.g.*, not the amounts called for by the extrapolated analysis), (iv) the Schottenstein Parties should possess the full set of Regenokine treatment records that would enable Orthogen to specify the full extent to which it has been

---

[3] The Texas 1782 is captioned *In re Orthogen International GmbH*, No. 5:24-mc-687-OLG (W.D. Tex.), and the Florida 1782 is captioned *In re Orthogen International GmbH*, No. 9:23-cv-80743-DMM (S.D. Fla.).

damaged, (v) those treatment records (among other relevant records) are the subject of the Schottenstein 1782, and (vi) if Orthogen files suit now and the German court issues a decision on its damages claims and a final judgment is entered before this Court decides the Schottenstein 1782, and if this Court thereafter were to authorize Orthogen to obtain the records through the Schottenstein 1782, Orthogen would not be able to present the information from those records to the German court or bring a new case or claim based on those records—even if the records showed its damages are much higher than the damages awarded based on the incomplete information. *Id.* ¶¶ 34-42.

Accordingly, Orthogen has been waiting for this Court to decide the Schottenstein 1782 before bringing the Contemplated German Proceeding. Unfortunately, Orthogen now is being prejudiced by its appropriate waiting, including because Dr. Schottenstein is trying to use Orthogen's waiting as a basis for arguing against its receipt of 1782 discovery.

## <u>BACKGROUND</u>

### A. Orthogen Licenses the Regenokine Program to Dr. Schottenstein and Mr. Capla

In 2011, Orthogen entered into a License Agreement with Mr. Capla alone, whereas in 2012, 2013, and 2014, Orthogen entered into License Agreements with both Mr. Capla and Dr. Schottenstein. Kruger Decl. ¶ 6 (citations in this form refer to the declaration of Dr. Kruger submitted with the Petition). The Agreements permitted Mr. Capla and Dr. Schottenstein to administer the Regenokine Program to patients in exchange for making specified royalty payments to Orthogen. *Id.* ¶ 8.

The 2011, 2012, and 2013 Agreements provided that Orthogen was to receive 40% of net fees (*i.e.*, gross fees after the deduction of certain costs and taxes) paid by patients who received Regenokine treatments. Supp. Kruger Decl. ¶¶ 4, 6. Under the 2014 Agreement, by contrast, Orthogen was to be paid a set dollar amount for each Regenokine treatment. *See id.* ¶ 9. The

Agreements required either Mr. Capla (the 2011 Agreement) or Mr. Capla and Dr. Schottenstein (the 2012-2014 Agreements) to submit reports to Orthogen identifying (i) the date, number, and nature of treatments administered to each patient, and (ii) the amount charged in connection with each treatment. *See id.* ¶¶ 5, 7; *see also* Kruger Decl. ¶ 11. The reports were to be accompanied by an affidavit attesting to the accuracy of the information contained in them. Kruger Decl. ¶ 12. In practice, Mr. Capla provided the reports and affidavits, but Mr. Capla and Dr. Schottenstein agreed to be "joint debtors" for "any and all payments that are due under or in connection with" the 2012-2014 Agreements. *Id.* ¶¶ 13, 15.

The royalty reports submitted in connection with the 2011-2013 Agreements were crucial for determining the per-treatment royalty fees set in 2014 Agreement because the per-treatment fees under the 2014 Agreement were designed to replicate the 40% of net fees to which Orthogen was entitled under the prior Agreements.[4] Supp. Kruger Decl. ¶¶ 9-12. Had the invoiced amounts reported under the prior Agreements been higher, Orthogen would have set the per-treatment amounts in the 2014 Agreement to be higher. *Id.* ¶ 12.

### B.   Dr. Schottenstein Reveals That He and Mr. Capla Defrauded Orthogen

During the relevant period, May 2011-May 2020, the royalty reports represented that a total of 1,325 Regenokine patient treatments were administered through NY Spine. Kruger Decl. ¶¶ 18-19. On December 27, 2022, however, Dr. Schottenstein filed his first verified complaint in the N.Y. Action, in which he included allegations indicating that (i) the number of Regenokine

---

[4] Reviewing a set of royalty reports from before and after the 2014 License Agreement illustrates the point. For February 2013, the royalty report to Orthogen identified (i) Dr. Schottenstein and Mr. Capla as having invoiced patients a total of $180,000, and (ii) Orthogen being entitled to a total of $72,000 (40% of the $180,000 reported invoiced amount). For December 2016, the royalty report to Orthogen identified (i) Dr. Schottenstein and Mr. Capla as having invoiced patients a total of $22,500, and (ii) based on the per-treatment royalty fees to which the parties agreed under the 2014 Agreement, Orthogen being entitled to a total of $9,000 (which works out to 40% of the $22,500 reported invoiced amount). Supp. Kruger Decl. ¶ 11.

treatments was far higher than reported (at least 3,500 according to Dr. Schottenstein's allegations versus the 1,325 reported to Orthogen), and (ii) Dr. Schottenstein and Mr. Capla each received millions of dollars more in connection with the treatments than would have been appropriate if the number of treatments reported to Orthogen was accurate. *See* Harwood Decl. ¶¶ 3-7. Dr. Schottenstein thereafter filed two amended verified complaints, in which he reiterated the 3,500 figure and alleged that he and Mr. Capla each earned "nearly $2 million per year" (from 2014 through 2020) from the treatments (after having alleged that they each had earned $6 million per year in his initial verified complaint). *Id.* As demonstrated in the Petition, if either verified allegation is true, it would mean that Dr. Schottenstein and Mr. Capla underpaid Orthogen millions in royalty fees.[5] *See id.*; *see also* Supp. Kruger Decl. ¶ 13.

After seeing Dr. Schottenstein's initial verified Complaint, Orthogen retained U.S. counsel and, in March 2023, sent letters to Dr. Schottenstein and Mr. Capla demanding that they pay the royalties they apparently owed based on Dr. Schottenstein's verified allegations. Schottenstein 1782, Dkt. 4-6. When Orthogen's letters did not result in a resolution, it decided to pursue the Contemplated German Proceeding against Dr. Schottenstein and Mr. Capla, in which it would assert claims for breach of contract and fraud. *See* Harwood Decl. ¶ 8. However, because Orthogen did not know the full scope of the fraud (and therefore the full scope of its damages), it decided first to seek 1782 discovery from Dr. Schottenstein, NY Spine, and Mr. Capla and his wife, Yolanda Capla (the "Caplas"). *Id.*

In May 2023 Orthogen filed the Schottenstein 1782 (which remains pending before this Court), and the Florida 1782 (directed at the Caplas). *Id.* ¶ 9. After a slew of dilatory tactics in

---

[5] In his fourth (and last) verified complaint in the N.Y. Action, Dr. Schottenstein removed the 3,500 and $2 million figures, but did not allege that the figures were incorrect or replace them with new figures.

the Florida 1782, which caused the Florida court to observe that the "case has been unnecessarily delayed at every turn by [the Caplas]," *Id.*, Ex. F at 3, the Caplas were ordered to produce responsive documents and sit for depositions, both of which occurred in April 2024. Harwood Decl. ¶ 15.

      **C.**   **Orthogen Pursues Additional Discovery After Obtaining More Evidence**

Shortly before the Caplas' depositions, Orthogen obtained information from two former employees of NY Spine, Pearl Chan and Derek Lee, that supports Orthogen's claims in the Contemplated German Proceeding, *id.* ¶¶ 16-17, and is consistent with Dr. Schottenstein's allegations in the N.Y. Action (i) about the number of patients who received Regenokine treatments, (ii) the amounts he and Mr. Capla received from those treatments, and (iii) that "[Mr.] Capla paid roughly two-thirds of his compensation to [Judith and Tomas Capla,] his parents, in order to shield this income," N.Y. Action, Dkt. 1 ¶ 78; Dkt. 24 ¶ 83. Ms. Chan and Mr. Lee provided, among other things, a set of shadow ledgers that reflect (i) more treatments and higher invoiced amounts than were reported to Orthogen, and (ii) that Mr. Capla diverted a significant amount of his Regenokine income to Judith Capla. Harwood Decl. ¶¶ 18-27. They further indicated that a portion of Mr. Capla's Regenokine income also was diverted to Tomas Capla, and that they possess further documents that may be relevant to Orthogen's anticipated claims. *See id.* ¶¶ 16, 29. Therefore, on June 20, 2024, Orthogen filed the Texas 1782 to obtain further information from Ms. Chan and Mr. Lee. *Id.* ¶ 30. The Texas 1782 was granted on July 16, 2024, and Ms. Chan and Mr. Lee began producing documents on August 9, 2024.[6] *Id.* ¶¶ 31-32.

---

[6] The Schottenstein Parties filed a belated objection to the Texas 1782 on October 2, 2024 (Dkt. 13), which now is fully briefed and awaiting a decision by the Texas court.

After obtaining information indicating that Mr. Capla diverted a portion of his Regenokine income to Judith and Tomas Capla, on October 31, 2024, Orthogen filed this Petition seeking discovery from them. *See id.* ¶ 34. Their records (showing how much diverted income they received) will further substantiate the fraud and assist Orthogen in its calculation of damages (by helping Orthogen piece together the full amount of Mr. Capla's underreported Regenokine income). *See* Kruger Decl. ¶¶ 43-45.

### D.    Orthogen Has Obtained Substantial Evidence of Fraudulent Underreporting and Underpayment

Based on Dr. Schottenstein's admissions in the N.Y. Action (*i.e.*, that he treated approximately 2,200 more Regenokine patients than he and Mr. Capla reported to Orthogen, and earned far more money each year than they reported), as well as the information Orthogen has obtained to date both through informal fact gathering efforts from Ms. Chan and Mr. Lee and its other 1782s, Orthogen has obtained evidence that it was defrauded in multiple ways under both the 2011-2013 Agreements and the 2014 Agreement. *See* Supp. Kruger Decl. ¶ 18.

The evidence includes Mr. Capla's shadow ledgers, which (i) identify many patients who received Regenokine treatments, but whose treatments were omitted from the royalty reports to Orthogen and therefore for whose treatments Orthogen received no payment, and (ii) for the subset of patients whose treatments were reported to Orthogen, show that Mr. Capla and Dr. Schottenstein charged the patients far more than was reported to Orthogen. *See id.* ¶ 19; *see also id.* ¶ 20 (describing additional evidence of specific underpayments and underreporting associated with specific patients). This evidence supports that, under the 2011-2013 Agreements, Orthogen was defrauded in two ways: (i) for undisclosed patients, it was not paid any of the royalty payments it was entitled for their treatments, and (ii) for disclosed patients, it was paid less than the required 40% of net fees that Mr. Capla and Dr. Schottenstein received in connection with

their treatments (because Mr. Capla and Dr. Schottenstein failed to report the full amounts they charged to those patients). *See id.* ¶ 21. Under the 2014 Agreement, the evidence also supports that Orthogen was defrauded in two ways: (i) for undisclosed patients, it again was not paid any of the required royalties, and (ii) it was fraudulently induced to agree to a lower per-treatment amount for all treatments under the Agreement than it would have required had it known the actual amounts that Mr. Capla and Dr. Schottenstein had been charging patients. *See id.* ¶ 22.

Dr. Schottenstein's Proposed Counterclaims ignore the above fraud, and instead incorrectly claim that Orthogen has no possible claims because (i) only the 2014 Agreement applies to its claims, and (ii) under the 2014 Agreement, Orthogen was entitled to a specified, per-treatment amount and therefore Mr. Capla and Dr. Schottenstein's intentional inaccurate reporting of the amounts they charged patients is irrelevant. Dkt. 15-2 ¶¶ 15-16. The claim is incorrect because, among other things, (i) it ignores the evidence that Mr. Capla and Dr. Schottenstein failed to report having provided treatments to (and thus paid none of the required royalties for) an entire subset of patients (which supports claims for fraud and breach of contract under all of the Agreements); and (ii) for the subset of patients whose treatments were reported to Orthogen under the 2014 Agreement, it ignores that Orthogen has a fraudulent inducement claim.[7] *See* Supp. Kruger Decl. ¶¶ 24-25.

Presumably because they know what the evidence will show, the Schottenstein Parties have sought to delay the Contemplated German Proceeding by lodging meritless challenges to every 1782 proceeding brought by Orthogen, often, as here, waiting months to file objections.[8]

---

[7] The Schottenstein Parties also ignore that for the subset of patients whose treatments were reported to Orthogen under the 2011-2013 Agreements, Orthogen has a claim for the difference between the royalties it received and the royalties it should have received under the 40% payment methodology if Mr. Capla and Dr. Schottenstein had accurately reported the amounts they invoiced to patients. *See* Supp. Kruger Decl. ¶¶ 9-13.

[8] They waited six months to challenge the Florida 1782, *see* Florida 1782, Dkt. 48; three months to challenge the Texas 1782, *see* Texas 1782, Dkt. 13; and two months to challenge this Petition, *see* Dkt. 15.

### E.  Prompt Resolution Is Needed

Orthogen could file the Contemplated German Proceeding today based on the verified allegations in Dr. Schottenstein's complaints in the N.Y. Action and the additional information it has obtained through the proof-gathering efforts described above. *Id.* ¶¶ 26, 32. However, litigants in Germany must plead and be prepared promptly to present evidence sufficient to establish not only their claims, but also their full damages. *Id.* ¶¶ 29-30. Although Orthogen currently possesses evidence providing concrete examples of fraud and damages with respect to many Regenokine patients, *see id.* ¶ 32, without the Schottenstein Parties' treatment records, it would have to use the evidence it currently has to present an extrapolated damages analysis to address the remainder of the patients and the full extent of its damages. *Id.* ¶¶ 33-36. Because a German court may reject the extrapolated analysis, Orthogen has been waiting for this Court to decide the Schottenstein 1782 before filing the Contemplated German Proceeding. *Id.* ¶¶ 42-43.

Not waiting would be irresponsible because if (i) Orthogen were to file the Contemplated German Proceeding today, (ii) a final judgment were entered on its damages claims before this Court ruled on the Schottenstein 1782, and (iii) this Court thereafter granted the Schottenstein 1782, Orthogen would not be able to present evidence obtained from the Schottenstein 1782 to the German court (or bring a new case or claim based on that evidence), even if the evidence showed that its damages were substantially higher than was awarded based on the incomplete information. *Id.* ¶¶ 41-42. Regardless of whether or not this Court permits it to obtain the discovery it seeks through the Schottenstein 1782, Orthogen will bring the Contemplated German Proceeding. *Id.* ¶ 45. But for the reasons discussed above, it has responsibly been waiting for this Court to decide the Schottenstein 1782 before bringing the Contemplated German Proceeding. *Id.* ¶ 44.

## **ARGUMENT**

The Court should grant Orthogen's 1782 application because (i) it satisfies 1782's three statutory requirements, and (ii) all four *Intel* factors favor discovery. Dkt. 5 at 20-25. The Schottenstein Parties' Proposed Counterclaims are based on meritless objections to the Petition. Therefore, if the Court rejects the Schottenstein Parties' objections and finds that the Petition satisfies 1782's statutory requirements, that the *Intel* factors favor discovery, and that the requested discovery should proceed, the Court should (i) allow the Schottenstein Parties to intervene to participate in the discovery, but (ii) deny their request to interpose the Proposed Counterclaims as futile.[9]

When, as here, a party appropriately is seeking to intervene in an action but also is seeking leave to pursue meritless claims or other relief, courts allow intervention, but deny leave to pursue the claims or other relief. *See, e.g.*, *Kirkland v. New York State Dept. of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983) (after permitting intervention, trial court was found to properly have limited the scope of the intervenors' participation); *Kamerman v. Steinberg*, 681 F. Supp. 206 (S.D.N.Y. 1988) (denying requested relief accompanying motion to intervene because "[e]ven if intervention were permissible, movants have not established that [their requested relief] is warranted"); *see generally* C. Wright & A. Miller, FEDERAL PRACTICE & PROCEDURE, § 1921 (3d ed.) (intervention either should be denied or conditioned on intervenor not asserting

---

[9] Although not the basis of any of the Proposed Counterclaims, the Schottenstein Parties baselessly accuse Orthogen of gamesmanship for not discussing in its Petition here a lawsuit currently pending in Germany in which it has sued Dr. Schottenstein. Dkt. 15-2 ¶¶ 61-62. As Orthogen has explained repeatedly—including in its opposition to the Schottenstein Parties' May 2023 motion to quash the Schottenstein 1782 (in which the Schottenstein Parties leveled the same baseless accusation)—the Pending German Proceeding has nothing to do with the Contemplated German Proceeding, which is why Orthogen did not address it in the Petition. It addresses different claims and a different time period. *See* Schottenstein 1782, Dkt. 16 at 1-2; *see also* Texas 1782, Dkt. 15 at 19-20.

counterclaim that would cause undue delay or prejudice (citing authority)).[10]

I.    **The License Agreements' German Forum Selection Clause Does Not Render the Petition Improper**

Relying on declarations from their German lawyer, Paul Scarcia-Scheel, the Schottenstein Parties premise their first and second Proposed Counterclaims on their incorrect assertion that by agreeing that a German court will decide "[a]ny dispute arising from or in connection" with the 2014 Agreement, Orthogen also agreed to forego use of 1782 to obtain evidence to use in connection with such a dispute.[11] *See* Dkt. 15-2 ¶¶ 17, 39, 57-60, 65 (citing 2014 License Agreement Art. 13.1-13.3). Notably, when the Schottenstein Parties improperly tried to keep Orthogen as a defendant in the N.Y. Action, Mr. Scarcia-Scheel submitted a letter opining that the 2014 Agreement's forum selection clause was *unenforceable under German law*. *See* N.Y. Action, Dkt. 121-2. He was of course wrong, as the Schottenstein Parties now concede. Now that the Schottenstein Parties' litigation needs have changed, Mr. Scarcia-Scheel's opinion about the clause also has changed. He now believes not only that it is enforceable, but that it precludes Orthogen from seeking 1782 discovery. Mr. Scarcia-Scheel is again wrong.

Courts treat the existence of forum selection/choice of law clauses as matters to be considered under the third *Intel* factor, not as precluding 1782 discovery. *See, e.g.*, *In re Ativos Especiais II – Fundo de Investimento em Direitos Creditorios – NP*, 2024 WL 1469550, at *14 n.10 (S.D.N.Y. Sept. 12, 2024); *In re BM Brazil 1 Fundo de Investimento em Participações*

---

[10] None of the cases the Schottenstein Parties cite in support of their intervention motion suggests that it is appropriate or even permissible for an intervenor in a 1782 proceeding—a petition to obtain discovery—to file counterclaims. *See* Dkt. 15-1 at 6.

[11] The Schottenstein Parties incorrectly argue that only the 2014 License Agreement is relevant to Orthogen's claims, *id.* ¶¶ 13, 96, when all four License Agreements are relevant because each governs Dr. Schottenstein's and Mr. Capla's conduct (and claims arising from their misconduct) during the time period when each was in effect. Supp. Kruger Decl. ¶ 16. The error is immaterial, however, because each Agreement contains a comparable German forum selection clause.

*Multistratégia*, 2024 WL 555780, at *12, (S.D.N.Y. Jan. 18, 2024), *rep. & recommendation adopted*, 2024 WL 554302 (S.D.N.Y. Feb. 12, 2024); *In re Cal. State Teachers' Ret. Sys.*, 2017 WL 1246349, at *4 (D.N.J. Apr. 3, 2017); *In re Polymer Solutions Int'l, Inc.*, 2019 WL 1239778, at *4 (D. Md. Mar. 18, 2019). Moreover, when, as here, a forum selection clause speaks only to where and under what law the parties' disputes will be resolved, and selects a forum whose courts, in applying the selected law, have demonstrated a receptiveness to 1782 discovery (like Germany), courts have found the third *Intel* factor does not counsel against discovery. *See id.*

That is because the third *Intel* factor counsels against discovery "[o]nly where the materials being sought are privileged or otherwise prohibited from being discovered or used [by a rule of the foreign jurisdiction]." *In re Tiberius Grp. AG*, 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020); *see Mees v Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015). Indeed, the Second Circuit has confirmed that the inability of a party to obtain the discovery sought under foreign law does not impact the third *Intel* factor, and that the factor counsels against discovery only when foreign rules exist "akin to privileges that *prohibit* the acquisition or use of certain materials." *Mees*, 793 F.3d 291 at 303 n.20 (emphasis in original).

The third *Intel* factor supports discovery here because, as Dr. Kruger explains:

[U]nder German law, the parties to a lawsuit are presumed to be permitted to use any evidence-gathering tools that are available to them. Indeed, a German court must consider whatever documents or other pieces of evidence a party presents to it, regardless of how the evidence was obtained (except when the use of the evidence would violate a fundamental constitutional right, which is not a concern here). . . . Therefore, as a general rule, German courts are receptive to the parties using whatever tools are available to them to obtain evidence, which would include Section 1782.

Supp. Kruger Decl. ¶¶ 53-54. As Dr. Kruger further explains, "[t]he forum selection clause here does not impact the general rule." *Id.* ¶ 55. "Rather, under applicable German legal principles, the text of the forum selection clause supports the conclusion that the parties can use any

evidence-gathering tools available to them, including 1782," because:

> Under German law, if a contract expressly provides certain rights or obligations with respect to a particular item or topic, the parties are assumed not to have intended to create other rights or obligations with respect to that specific item or topic.

> Here, however, neither the forum selection clause nor any other aspect of the parties' License Agreements addresses one way or the other what evidence-gathering tools a party may use to obtain evidence for use in a lawsuit brought in Germany under the License Agreements, including whether a party can use 1782. As a result, the legal proposition that the Schottenstein Parties referenced in their Proposed Counterclaims (*i.e.*, that "[a]s a general matter, if there is no provision in a contract providing for a thing, then the German courts will likely conclude that the parties did not intend to create any reciprocal rights and obligations," Dkt. 15-2 ¶ 56) is inapplicable. That proposition is inapplicable when, as here (with respect to the parties' ability to use specific evidence-gathering tools), the parties' agreement does not address the matter.

> Moreover, as noted above, under German law, the parties to a lawsuit are presumed to be permitted to use any evidence-gathering tools that are available to them. Therefore, the Schottenstein Parties' assertion that "if the parties had wanted to allow American-style discovery as an exemption, they would have included it expressly in article 13.3 of the 2014 License Agreement," DKt. 15-2 ¶ 57, is incorrect. Because article 13.3 does not address what evidence gathering tools a party may use to obtain evidence (it addresses an entirely different topic),[12] no need existed to provide "an exemption" to the language in the License Agreements to address that (unaddressed) topic. Having not addressed the matter, the parties would be presumed to be able to use any proof-gathering tools available to them, including 1782.

> Also relevant here is the general concept in German civil law that agreements must be interpreted in accordance with the parties' will and intent. *See* Section 133 of the German Civil Code. When the parties entered into the License Agreements, for the reasons stated above, they would have had no reason to expect that the forum selection and choice of law clauses would have modified the presumption that parties to a German lawsuit may use any evidence-gathering tools that are available to them.

> Rather, they would have had the contrary expectation: that the forum selection and choice of law provisions would not limit the tools through which they could gather evidence, including 1782. Per the forum selection clause, they would have expected that a German court (rather than some other court) would resolve disputes between the parties, and per the choice of law clause, they would have expected that German law would govern, *which importantly contains no prohibition on parties seeking evidence through 1782.*

---

[12] It addresses a circumstance in which Orthogen could bring a substantive claim against Dr. Schottenstein and Mr. Capla in the United States (*i.e.*, if it were to pursue a claim for injunctive relief). *See* Kruger Decl. Ex. D, Dkt. 7-4 Art. 13.3.

Also relevant is that the parties would have been presumed to enter into the License Agreements with the understanding that historically, U.S. courts have made 1782 discovery available to German litigants.[13] That backdrop, of which the parties would be presumed to have been aware, would have supported an expectation that 1782 would be an available evidence-gathering tool.

*Id.* ¶¶ 56-61 (emphasis in original).

In *BM Brazil*, faced with similar facts, including a forum selection clause that provided for English courts to decide under English law "any dispute arising from or in connection with" a contract, a court in this district recently found that the forum selection clause did not prohibit 1782 discovery. 2024 WL 555780, at *15. After questioning whether the forum selection clause even applied given that (as here) the applicant was seeking discovery from a non-party to the contract, the court cited favorably a declaration from the applicant's English counsel that opined that English courts would construe the forum selection clause there the same way Dr. Kruger has opined German courts would construe the clause here: "as 'prohibiting the bringing of substantive disputes in foreign jurisdictions,'" but *not* 1782 "'applications seeking evidence *in support* of substantive proceedings in the courts of England.'" *Id.* at *2, *13-15. From there, the court reached a conclusion that equally is applicable here: that English procedural rules incorporate 1782 discovery because "English courts are generally *receptive* to Section 1782 discovery applications," and therefore, by "'sign[ing] up' for English rules governing discovery, part of what [the parties] 'signed up' for was their [mutual] ability to seek discovery from nonparty U.S. witnesses pursuant to Section 1782." *Id.* at *13 (emphasis in original).

*BM Brazil* is directly on point because (i) Orthogen is seeking discovery from Judith and

---

[13] *See Kang v. Nova Vision, Inc.*, 2007 WL 1879158, at *2 (S.D. Fla. June 26, 2007) (citing cases and observing that "there exists a substantial amount of case law where courts have found that German commercial courts are an appropriate forum for § 1782 assistance"); *see also In re Thales Dis Ais Deutschland GmbH*, 2021 WL 7707268, at *3 (N.D. Tex. Nov. 5, 2021) ("German courts are often receptive to § 1782 evidence."); *In re Cal. State Teachers' Ret. Sys.*, 2017 WL 1246349, at *4 ("German courts often welcome evidence from § 1782 applications[.]").

Tomas Capla, who are non-parties to the License Agreements (though even if they were parties, that would not change the result), (ii) the forum selection clause dictates that substantive disputes be decided in Germany, but does not address the proof-gathering tools that the parties can use to support their claims, (iii) as Dr. Kruger explains, the relevant inquiry therefore is what the parties would have expected when entering the Agreement with respect to the use of proof-gathering tools, including 1782, and (iv) based on the considerations outlined by Dr. Kruger (excerpted above), the parties would have expected that the forum selection clause would not limit the proof-gathering tools available to them.

Another court in this district recently reached a similar conclusion, stating it was "plac[ing] no weight on [a] forum-selection clause" that stated "that any disputes arising from [the contract] shall be governed by Brazilian law," because (like here) it did "not clearly speak to discovery or show intent to be bound only by Brazilian evidentiary law." *In re Ativos*, 2024 WL 1469550, at *14 n.10. Other courts also have found (in comparable circumstances) that forum selection clauses do not to counsel against 1782 discovery. *See In re Cal. State Teachers' Ret. Sys.*, 2017 WL 1246349, at *4 (finding existence of German forum selection clause "does not mean that [German litigant] could not [use § 1782] to investigate [claims]"); *In re Polymer Solutions Int'l, Inc.*, 2019 WL 1239778, at *6-7 (1782 discovery not prohibited by "forum selection clause [that] did not distinguish between substantive and procedural application").

Although some courts have found that a forum selection clause counseled against 1782 discovery, they did so based on the specific circumstances of the cases, which are distinguishable from those here. Unlike here, they involved circumstances where, for example, (i) it was unclear whether the courts in the foreign forum would be receptive to the use of 1782, *see Venequip, S.A. v. Mustang Mach. Co.*, 2022 WL 3951173, at *2 (S.D. Tex. Aug. 30, 2022) ("[N]o clear

18

guidance [existed] as to how Swiss authorities would consider the [American-style discovery] . . . sought in this case."); (ii) the 1782 petitioner litigated in the foreign court for years before seeking documents through 1782 that "appear[ed] . . . [within] the jurisdictional reach" of the foreign court,[14] *Banoka v. Westmount Int'l Dev. Inc.*, 2022 WL 480118, at *2 (S.D. Tex. Feb. 10, 2022); and (iii) it was "clear that [p]etitioners hope[d] to obtain in [a U.S. court] what they fear[ed] the [foreign] courts w[ould] deny them," *id.*

Because Orthogen, Dr. Schottenstein, and Mr. Capla agreed to litigate their disputes in a forum receptive to 1782 discovery, and because the forum selection clause is silent with respect to what proof-gathering tools are available to the parties, the clause does not counsel against 1782 discovery here, and therefore the first and second Proposed Counterclaims fail.

## II.    *Atlantic Marine* Has No Bearing on 1782 Proceedings

The Schottenstein Parties' third Proposed Counterclaim is premised on their assertion that *Atlantic Marine* requires that this Court dispense with the traditional *Intel* analysis and apply an alternative analysis that would result in the denial of the Petition. Dkt. 15-2 ¶¶ 112-21. The Schottenstein Parties describe their alternative analysis as consisting of "public interest factors," *id.* ¶ 119, which they do not identify, and which, in any event, would not apply. In the 13 years since *Atlantic Marine* was decided, no court has applied such factors in the 1782 context, including the specific public interest factors referenced in *Atlantic Marine*. That is because *Atlantic Marine* has nothing to do with 1782, and as courts have uniformly agreed, the existence of a foreign forum selection clause should be addressed under the third *Intel* factor.

*Atlantic Marine* addressed two things: (i) the analysis a court should apply when a

---

[14] Here, Judith and Tomas Capla will not be parties to the Contemplated German Proceeding. With respect to the Schottenstein Parties, although Dr. Schottenstein will be a party (NY Spine will not), as the Florida 1782 court found with respect to Mr. Capla, the "difficulty in obtaining discovery from [Dr. Schottenstein] in that proceeding" tips the discovery analysis in Orthogen's favor. Florida 1782, Dkt. 38 at 16-17; Supp. Kruger Decl. ¶ 27.

defendant seeks to enforce a forum selection clause after being sued somewhere other than the agreed forum, and (ii) the proper procedural mechanism for the defendant to enforce the forum selection clause. *See* 571 U.S. at 52, 59-61. In other words, in *Atlantic Marine*, the Court addressed (i) the analysis that would have applied here had Orthogen ignored the German forum selection clause and filed suit against Dr. Schottenstein and Mr. Capla in this Court (or in some other U.S. court), and (ii) the procedural mechanism that, in that circumstance, Dr. Schottenstein or Mr. Capla would appropriately have used to enforce the forum selection clause. *See id.* *Atlantic Marine* did not address anything comparable to the issue here: a party planning to file suit in the proper forum and seeking 1782 discovery for use in that properly-forumed suit.

Not surprisingly, then, the analysis that *Atlantic Marine* used to address the (distinct) issues presented in *Atlantic Marine* has no applicability here. The Court held that if a plaintiff files suit in a non-agreed forum and the agreed forum is outside the United States, (i) the defendant should move to dismiss the suit under the doctrine of *forum non conveniens*, (ii) in assessing the motion, the court should only consider a set of "public-interest factors" and any "arguments [the plaintiff may advance] about the parties' private interests" should not be considered (because the plaintiff already agreed to the other forum), and (iii) the plaintiff bears the burden of demonstrating that the "public-interest factors" warrant not giving effect to the parties' prior agreement regarding forum. *Id.* at 64. The Court observed that the "public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id.* at 62 n.6 (citation omitted).

Because *Atlantic Marine* dealt with issues unrelated to a 1782 petition, the "public-interest factors" identified therein have no applicability to such a petition. Those factors are

directed at evaluating whether a reason exists for a dispute not to be resolved in the parties'

chosen forum; here, however, the parties' dispute will be resolved in the chosen forum. Even if

this Court were inclined to look beyond the *Intel* factors and evaluate the existence of the

German forum selection clause under a "public interest" analysis, any such analysis should focus

on whether the discovery sought would further the "twin aims" of Congress that underly 1782:

"providing efficient assistance to participants in international litigation and encouraging foreign

countries by example to provide similar assistance to our courts." *Intel*, 542 U.S. at 252 (internal

quotation marks omitted). Evaluating the discovery sought under those "twin aims" would lead

to the same conclusion as the analysis under the *Intel* factors: the discovery should be allowed, as

it would enable Orthogen efficiently to obtain crucial evidence for the claims it will be bringing

in Germany, and encourage Germany to provide similar assistance to U.S. persons seeking

comparable evidence in Germany.

## III.    Orthogen's Petition Satisfies 1782's Second Statutory Requirement

As the basis for their fourth Proposed Counterclaim, the Schottenstein Parties incorrectly

assert that the Petition does not satisfy 1782's second statutory requirement because (i) the

Contemplated German Proceeding is not sufficiently imminent, and (ii) Orthogen does not

actually intend to bring the Contemplated German Proceeding. *See* Dkt. 15-2 ¶¶ 123-32.

The first argument is contrary to settled law. The Supreme Court in *Intel* made clear that

1782 requires only that a proceeding before a foreign tribunal "be within reasonable

contemplation." 542 U.S. at 259. To satisfy that standard, an applicant seeking discovery for a

"planned proceeding[]" need only "provide some objective indicium that the action is being

contemplated." *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d

113, 123-24 (2d Cir. 2015) (emphasis added). Accordingly, courts in this district have found that

the standard is met when, as here, the applicant has "retained counsel," who has (i) "begun preparing the necessary pleadings," (ii) "provided declarations expressing intent to initiate" the foreign proceeding, (iii) "set forth a theory of liability," and/or (iv) sent a "detailed demand letter" to the intended defendants. *In re Kuwait Ports Auth.*, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021); *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018); *In re Zouzar Bouka; Vision Indian Ocean S.A.*, 637 F. Supp. 3d 74, 85-87 (S.D.N.Y. 2022). Here, Dr. Kruger's declarations provide "concrete" and "objective" proof that Orthogen has the evidence and theories it needs to file suit, and is not seeking discovery merely in the hope that it might uncover evidence that will first allow it to sue. *See Certain Funds*, 798 F.3d at 124.

Seeking to sidestep the above law, the Schottenstein Parties argue (inconsistently) that under *Intel*, (i) "pre-suit discovery" is not permitted, *see* Dkt. 15-2 ¶ 3, and (ii) pre-suit discovery is permitted, but only if the filing of the contemplated lawsuit is "inevitable," *see id.* ¶¶ 127-129. Both arguments fail under the above case law and are foreclosed (because the Second Circuit already has interpreted *Intel* as allowing pre-suit discovery without there being any inevitability requirement). The argument also fails because, as demonstrated below, the facts and holding of *Intel* confirm that no inevitability requirement exists. *In re Ativos*, 2024 WL 4169550, at *5 ("prospective use of the evidence need not be imminent").

The appellee in *Intel*, Advanced Micro Devices, Inc. ("AMD"), triggered an antitrust investigation into Intel by lodging a complaint with the Directorate-General for Competition (the "DG Competition") of the Commission of the European Communities (the "Commission"). *Id.* at 250. Importantly, that antitrust investigation was neither a "foreign proceeding" within the meaning of 1782, nor guaranteed to result in one. *See id.* at 254, 257-58. As the Court explained, upon completing its investigation, the DG Competition could (i) opt against prosecuting Intel—a

decision that would be appealable by AMD to the Court of First Instance, *and if AMD appealed*, would result in a "foreign proceeding," or (ii) decide to prosecute Intel, which would result in a "foreign proceeding," *i.e.*, a hearing before the Commission, *id.* at 250. But if the DG Competition opted against prosecuting Intel, *and if AMD decided not to appeal that decision*, then no "foreign proceeding" would have occurred. *See id.* at 254, 257-58.

The Supreme Court nevertheless ruled that AMD was entitled to 1782 discovery during the DG Competition's investigation because, under the circumstances, the Court deemed it likely that the investigation would result in a foreign proceeding, whether by AMD's appeal of a decision by the DG Competition not to prosecute or, if the DG Competition decided to prosecute, by a hearing before the Commission. *Id.* at 252. In other words, a foreign proceeding was reasonably contemplated—and 1782 discovery therefore was allowed—because the DG Competition's investigation was likely to result in a "foreign proceeding."

The Schottenstein Parties' incorrectly read *Intel* as turning on the supposed *inevitability* of a foreign proceeding, *see* Dkt. 15-2 ¶¶ 127-30, when what mattered was that the DG Competition's decision to prosecute or not to prosecute was *likely* to result in a "foreign proceeding," and therefore a foreign proceeding was "reasonably contemplated." *See Intel*, 542 U.S. at 258-59. Regardless, here, Orthogen has shown that the filing of the Contemplated German Proceeding is inevitable. After this Court rules on the Schottenstein 1782, Orthogen will file the Contemplated German Proceeding. Supp. Kruger Decl. ¶ 45. If the Court authorizes Orthogen to take discovery of the Schottenstein Parties, it will file after it completes the discovery. *See id.* ¶¶ 27, 43, 45. If the Court does not authorize the discovery, it will file based on the information it has obtained already (and any additional information it obtains through its other efforts). *Id.* ¶¶ 43, 45. Either way, Orthogen will be filing the Contemplated German

23

Proceeding. *Id.* ¶ 45. The Schottenstein Parties alternative argument—that Orthogen does not actually intend to file the Contemplated German Proceeding—therefore also fails.

## IV.    The Schottenstein Parties' As-Applied Constitutional Challenge Fails

The Schottenstein Parties' final Proposed Counterclaim asserts an unsustainable as-applied challenge to the 1782 statute, claiming that the statute would be unconstitutional if applied to allow discovery here, because it supposedly would "create two arbitrary classes of people": litigants to contemplated foreign proceedings who would have access to pre-suit discovery, and litigants to contemplated U.S. proceedings who generally would not. Dkt. 15-2 ¶¶ 135-37. An as-applied challenge is not proper here because the Schottenstein Parties cannot show that the application of 1782 in this proceeding to authorize discovery from Judith and Tomas Capla would deprive *them* of a constitutional right when they (i) will be permitted to participate in any discovery the Court authorizes here, and (ii) could have applied for reciprocal discovery, and, if they had and had demonstrated an entitlement to it, this Court could have authorized it.[15] *See Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (as-applied challenge analyzes whether statute "deprived *the individual to whom it was applied* of a protected right (emphasis added)). In any event, even if the Schottenstein Parties could pursue the as-applied challenge, it fails because Congress already has identified a rational basis for allowing broader pre-suit discovery to foreign litigants under 1782 than to U.S. litigants under the Federal Rules.

As the Schottenstein Parties concede, their as-applied challenge is subject to "rational basis" review, Dkt. 15-2 ¶ 142, a nearly insurmountable standard under which "[a] statute is

---

[15] *See, e.g.*, *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) (courts have discretion to grant 1782 applications conditioned on reciprocal discovery); *In re Porsche Automobil Holding S.E.*, 2021 WL 2530277, at *3-6 (S.D.N.Y. June 21, 2021) (courts have discretion to approve 1782 application conditioned on reciprocal discovery, but generally should do so only upon timely request for such discovery by party opposing 1782 application (citing *Intel*, 542 U.S. at 262)).

presumed constitutional," and classifications such as the one supposedly created by 1782 are lawful so long as "there is a rational relationship between the disparity of treatment and some legitimate purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320-321 (1993). Courts "will not overturn such a statute unless the varying treatment of different groups . . . is so unrelated to the achievement of any combination of legislative purposes that [it] can only [be] conclude[d] that the legislature's actions were irrational." *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462-63 (1988). To prevail on their challenge, the Schottenstein Parties bear the burden of disproving "every conceivable basis which might support" the 1782 statute. *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (quoting *Heller*, 509 U.S. at 320).

Their challenge fails because Congress already *has* expressed a rational basis for allowing 1782 discovery for use in contemplated foreign proceedings: meeting the "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to [federal] courts." *Intel*, 542 U.S. at 252. Congress's twin aims cannot be said to be "so unrelated" to the separate classifications asserted by the Schottenstein Parties as to be "irrational." *Kadrmas*, 487 U.S. at 462-63. When, as here, "there are plausible reasons for Congress' action, [judicial] inquiry is at an end." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) (citation omitted). Because a rational basis exists for the purported classifications created by 1782, the "'wisdom, fairness, or logic of [Congress's] legislative choice[]" to allow 1782 discovery for contemplated foreign proceedings is not subject to "second-guessing" by courts. *United States v. Amalfi*, 47 F.4th 114, 125 (2d Cir. 2022).

## CONCLUSION

Accordingly, the Court should allow the Schottenstein Parties to intervene to participate in discovery in this proceeding, but deny their request to interpose their Proposed Counterclaims.

Dated: January 28, 2025

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.

*/s/ Christopher B. Harwood*
Christopher B. Harwood
Matthew Garry
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com
mgarry@maglaw.com

*Attorneys for Petitioner Orthogen
International GmbH*